# Earnest's Appeal.

1. Where a husband buys real estate and has the deed made to his wife (no interests of creditors being involved) the legal presumption is that a gift was intended; and when the husband subsequently alleges a trust in his favor, he must, in order to rebut the presumption, prove by clear, explicit and unequivocal evidence, not only the fact of payment of purchase money by him, but all the essential requisites of the alleged trust.

2. The standard of proof required in such case considered, and the evidence adduced in the present case held insufficient to rebut such presumption.

April 10, 1884.   Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and CLARK, JJ.   GREEN, J., absent.

ERROR to the Court of Common Pleas No. 2, of *Philadel-phia county*. In equity: Of January Term, 1884, No. 188.

Bill in equity, between John Hill, complainant, and Henry W. Earnest and Mary Ann Earnest his wife, defendants, praying for a decree that the defendants execute a conveyance of the legal title of certain premises to complainant. The bill averred, inter alia, that on May 14, 1862, the complainant bought a house and lot, No. 804 South Tenth street, in the city of Philadelphia, for which he paid $4,300, of his own money, and had the deed made in the name of his wife Elizabeth, it being understood and agreed between himself and his wife that she should hold the same in trust for him, and should by deed or will vest the legal title in him or in a purchaser from him, at his request. That Mrs. Hill, without having executed such conveyance, died in 1875, intestate and without issue, leaving to survive her, her husband, the complainant, and one sister, Mary Ann Earnest, wife of Henry W. Earnest, the defendants. That the defendants had, upon request by complainant, refused to convey to the complainant the legal title in said premises; and the bill prayed that they be required so to do.

The answer admitted the above facts stated in the bill, other than the alleged trust, which the defendants denied.

The cause was referred to an examiner, and subsequently to a Master (Hampton L. Carson, Esq.), who, after finding, in detail, the undisputed facts, reported as follows upon those which were disputed:

It was alleged by the complainant's counsel that Mrs. Hill knew of the object of the conveyance, and assented to it; that it was not a gift to her, but that she considered herself a trustee for her husband, and had agreed to convey or will it according to his directions. Mr. Hill testified to conversations with his wife, some of them at or about the time of the purchase, and one of them at the time of the purchase, in which he said: "I am going to put the property in your name with the understanding that it would revert to me after your death. She agreed to that. It was consummated in that way." The force of his testimony is broken by that of Mrs. Earnest, who testified to conversations with him in which he said: "All he had in it was a life estate, and when it came into my hands it should be clean and clear. . . . . . He always stuck to it that the house belonged to my sister. . . . . . He always said that he had nothing more than a life estate in it." Again Mrs. Earnest says: "Mr. Hill said: 'Sis, I have bought this house for Liz, and gave it to her as her own.' I said, 'Liz, is that so?' She said, 'Yes.' I said, 'Won't you show me the deeds?' and she did.

If these facts be true, they are so inconsistent with those stated by Mr. Hill as to deprive his testimony of value. Mr. Hill was not called in rebuttal.

As Mr. Hill and Mrs. Earnest are interested parties to this suit, and their testimony is contradictory, the Master strikes them both from the list of witnesses.

Thomas Brennan testified to admissions made by Mrs. Hill, while Joseph T. Richards testified to admissions by Mr. Hill. It was said in argument that Mr. Brennan was tainted by self-interest as a creditor of Hill, with no hope of payment save that of Hill's success in this suit, while Richards had an interest as the son-in-law of the defendants. The Master does not believe that interest influenced them in any appreciable degree, but as one testified to conversations as old as 1867, and therefore to be received with caution, and the other was not very clear in his recollection of the exact words used in 1876, they in effect neutralize each other; and they also may be stricken from the list of witnesses.

We are then thrown back upon the evidence of White and Fuller, both of whom were entirely without bias of any kind. White was objected to as a witness to conversations with Mrs. Hill under the exception to the Act of 1869, the assignor of the thing or contract in action being dead. The Master rules that the Act only applies to parties in interest or to those claiming through the deceased party.

As Mr. White does not occupy either relation, he is competent; the same ruling applies to Mr. Fuller. Mr. White testified to a conversation with Mrs. Hill in 1870, or '71 at the time Mr. Hill was lying dangerously ill. She expressed uneasiness about the property, and was assured by White that she need not feel troubled, as she held the title and the position would not be changed. " As near as I can recollect she said, ' This is Mr. Hill's property, and I didn't know but what it might go to some of his heirs.' She spoke of a brother of Mr. Hill towards whom she did not seem to have a kindly feeling. I assured her there would be no difficulty about that, as the title was in her and would be safe enough. That seemed to satisfy her, and she was more calm and contented." This is evidence of an uneasy mental condition, possibly arising from a knowledge that the property was not absolutely hers, but it is not very clear or conclusive upon the point in dispute. On this conversation the witness was not cross-examined.

Mr. Fuller said: " I conversed with her three times upon the subject. I don't think she expressed herself except to say that it would be a good thing for John to buy it, as he would

have something to support himself when he got out of employment or become disabled."

*Q.* "Was it your impression, from what she said, that she regarded herself as the absolute owner of the property?"

*A.* "No; as a sort of trustee, though she did not use that word."

Though the question was not objected to, the Master does not consider this testimony of much value standing alone. The impressions of a witness are inadmissible, and the exact words of Mrs. Hill which induced Fuller to use the word "trustee" are not given. On cross-examination it was said that "all these conversations were before the purchase of the house. One was just before; just as they were closing the bargain."

Mrs. Hill died without ever having conveyed the property and without a will. Nor did Mr. Hill ever request his wife either to convey or incumber it for his benefit or her own. It was alleged that she was insane and therefore disabled from making a deed or will. It is clear that she was peculiar, having suffered from paralysis in 1859. : . . . . The Master is not satisfied that her peculiarities amounted to such a degree of insanity as to disable her from executing a legal instrument. . . . . . The question is not important, however, for, if a trust be established, equity would not permit it to fail through the insanity or recalcitrancy of the trustee.

Mr. Hill abstained for many years from all interference with the property. He neither collected the rents, nor made any effort, except on one occasion, to lease the property, which he knew was standing idle. He did not pay the taxes, but permitted his wife to do so. Subsequent to the purchase of the house, and during the short period that he lived with his wife at the house as a home, he gave her large sums of money. When they separated they remained apart for years, she at boarding, he at Mrs. Clifton's, the house of her mother. His conduct may be explained in part by these circumstances. After his wife's death, in October, 1875, he entered into possession, paid three years' arrears of taxes, rented the property, took the title papers and is now receiving the rents. He did not communicate his claim to the defendants, and did not file his bill until December 11, 1879.

The Master, after a review of the authorities, showing that "the legal presumption is against the complainant, and it will require strong proof to rebut it," reported as follows:

Apply these principles to the case in hand. The Master cannot overlook the fact that, though all objections to the competency of John Hill were withdrawn on the condition of the admission of Mrs. Earnest as a witness, yet under the

grave view of such a case taken by the court in Buchanan *v.* Streeper, 11 W. N. C., 434, his testimony is to be weighed with the utmost care. It is not clear, in point of time, when the conversations testified to by Hill occurred. It would seem that for some time he had had a certain house in view that he wished to buy, and on a certain day, having drawn from White about ($6,000) six thousand dollars, he sent for Mr. Callan, the owner, and, after some little talk, "bought the house." "I paid forty-three hundred dollars. I left the money in his presence with my wife, to pay him. . . . . . I ordered the deed to be made in my name." This evidently was all on the same day when the bargain was closed. After dinner, presumably on that day, he bought a horse and wagon, and took his friends, Fuller and White, to drive, who gave him the advice already considered. A change of intention was the result, for he subsequently states "the title was put in my wife's name, by my consent, after explanations from my conveyancer, who said she could not convey without my signature." When did this take place? There is nothing to guide us in determining whether it was a day or a month previous to the day of settlement and delivery of the deed; but it is clear that it did not occur on the day of settlement, for on cross-examination he says, "I gave my wife the money she paid for it; I was not at home at the time of payment." Mr. Hill then testified to conversations with his wife about the property, in which it was understood that the property was to be his at her death. These conversations took place at or about the time of the purchase. There was one conversation previous to the purchase. At the time of making the purchase, I said, "I am going to put the property in your name, with the understanding that it would revert to me after your death. She agreed to that." This is far from being clear, satisfactory, or consistent. The word "purchase" is doubtful in meaning. It does not mark the time. It cannot mean day of settlement, for he says he was not at home at that time. It cannot mean the day of execution of the deed, for there is no intimation that the deed was prepared and held for examination, or that the conversation with Mrs. Hill took place in the presence of the conveyancer. If it means, as is most probable, the day on which the bargain was struck with Callan, when he says, "I bought the house," then it contradicts his previous testimony that he ordered the deed to be made in his own name, and that it was not until after conversation with his friends, and subsequently with his conveyancer, that his change of mind took place. This conflict or obscurity of statement may be explained by referring all these conversations to different days and times; nor is it to be wondered at that Mr. Hill's recollection should be confused,

as he is detailing conversations which occurred about eighteen years before, but it certainly does not meet the requirements of proof indicated by Rearick's Exrs. *v.* Rearick, ut supra, nor is it, in the language of Buchanan *v.* Streeper, "full, clear, and convincing."

Mrs. Earnest's testimony to admissions made by Hill, contrary to his own interest, still further shake confidence in it, and the Master has already ruled that both witnesses may, for the practical purposes of decision, be considered as destructive of each other. What other testimony is there in the cause? The only conversation that Mr. White ever had with Mrs. Hill was ten years after the deed had been put in her name, and this would be admissible only in corroboration of prior arrangements at the time of the execution of the deed previously established by proof. The same is true of Brennan's testimony, even if its force were not neutralized by that of Mr. Richards. In order then to ascertain what took place at the time the deed was executed and delivered we are limited to the testimony of Fuller. There is "the pinch of the case." Mr. Fuller said he had had three conversations with Mrs. Hill, all of them were before the "purchase" of the house. One was some months before, and one was "just as they were closing the bargain." These words do not fix the time; they may mean the day of settlement, or they may mean, as is most probable, the day when Hill closed with Callan. This was the day on which Fuller went to see the house, and came back with Hill and had a conversation with Mrs. Hill, in which Fuller, not Mrs. Hill, said, "It would be a saving fund for him." It does not appear that in any of the three conversations she said anything that could be relied on with safety, nor does the aggregate of what she said at all times weigh heavily on the scale. Fuller says: "I don't think she expressed herself except to say that it would be a good thing for John to buy it as he would have something to support himself when he got out of employment or became disabled." Then followed a question of doubtful propriety: "Was it your impression from what she said that she regarded herself as the absolute owner of the property?" *A.* "No, as a sort of trustee, though she did not use that word." This answer may mean much or little, but as long as Mrs. Hill's words are not given, and as all the conversations recalled are eighteen years old, the Master cannot rely upon this evidence as of value. The residuum of the analysis is the impression of a witness which is undoubtedly insufficient to sustain a resulting trust. How can it be said that the testimony is "full, clear and convincing?"

The case is full of hardship; it is true, the defendants are

mere volunteers, and through the misfortune of Mrs. Hill's inability or unwillingness to make a will, are enabled to enjoy the fruits of Mr. Hill's hard toil, and to deprive him of that which he earned at the risk of his life or liberty. Hardships, however, are not sufficient to abrogate well-established rules of law, intended to guard the muniments of title to real estate or to check the designs of artifice and fraud. The bill is dismissed; the costs are to be divided between the parties.

The complainant filed, inter alia, the following exceptions to the Master's report:

1. Because the Master has erred in finding that the complainant's equitable title to the real estate in question was not sufficiently established by the evidence.

8. Because the Master has found the presumption of gift to the wife arising from the title being taken in her name, must be rebutted by the same measure of evidence as that required to establish the fact of payment by the husband.

9. Because the finding is against the law.

After argument these exceptions were sustained by the court, in the following opinion by MITCHELL, J.:

The Master having found all the facts substantially in complainant's favor, and having stated the law with clearness and accuracy, nevertheless felt himself constrained to report a decree against the prayer of the bill, because "the legal presumption is against the complainant, and it will require strong proof to rebut it," and he did not find the proof sufficiently "strong, full, and convincing," for that purpose.

In this conclusion we are unable to concur. The presumption of a gift under the circumstances is merely a presumption of fact, which is to prevail in the absence of evidence, or when the transaction is altogether unexplained. It raises a legal intent in the absence of evidence, but the actual intention may be gathered from the circumstances, and when it can be so gathered it must prevail. "Although a purchase in the name of a wife or child, if altogether unexplained, will be deemed a gift, yet you may take surrounding circumstances into consideration, so as to say that it is a trust, not a gift:" JESSEL, M. R., in Marshal *v.* Crutwell, L. R., 20 Equity Cases, 329. The presumption merely determines the burden of proof, and though, of course, the evidence must be satisfactory, yet this case does not differ from any other in that respect. "Taking into view all the circumstances, as I understand I am bound to do, as a juryman, I think," etc.: JESSEL, M. R., in case above cited.

The cases in which it is said that proof must be "strong," "clear," "convincing," and the like, by which the learned Master felt himself controlled, are not in conflict with the

foregoing views if the language be considered in connection with the facts before the courts at the time. Thus, in McGinity *v.* McGinity, 13 P. F. S., 38, it was the cardinal fact whether or not the plaintiff's money paid for the land that was in dispute, and it was in reference to that that SHARS-WOOD, J., says " the evidence ought to be clear, explicit, and unequivocal." So, in Buchanan *v.* Streeper, 11 W. N. C., 434, the language of THAYER, P. J., that the proof must be " full, clear, and convincing," has reference to the same thing. " The evidence must go distinctly to the fact of payment."

Bearing in mind here that there is no question of fraud, no claim of creditors, nothing but the bare question of gift or resulting trust between the husband whose money admittedly paid for the house, and a volunteer heir of the wife, we see no reason to hold the complainant to any more stringent rule as to evidence than is always required of a plaintiff upon whom the presumption of law, from the pleadings, casts the burden of proof. Tried by this standard, we think complainant has established his case. At the time of the purchase he has earned the money in his business, and proposes to buy himself a house. In view of his habits, the suggestion was made by his friend, and for his sake, that the title should be put in his wife's name as a security for a provision for the future, to him as well as to her. In this suggestion he acquiesced, and it was carried out. Had the contingency, which has now arisen, been pointed out to him at the time, there is not the slightest doubt, on the evidence, that he would have expressed his real intention by providing for his own right as against any claims from his wife's relatives. The conveyance to his wife was the means, not the end desired, and the wife having enjoyed the property during her life, it should now go to him freed from all claims by mere strangers.

The first, eighth and ninth exceptions are sustained, and a decree may be drawn for a conveyance as prayed in the bill, with costs.

A decree was entered, in accordance with the prayer of the bill, whereupon the defendants took this appeal, assigning for error the sustaining of said exceptions to the Master's report, and the decree.

*Henry W. Hall* (*Henry C. Thompson* with him), for the appellants.

*Richard S. Hunter*, for the appellee.

Mr. Justice CLARK delivered the opinion of the court, May 26, 1884.

The appellants hold under the deed of Elizabeth Hill; they are intrenched behind, and hold all the muniments of a legal title. From this citadel they cannot be dislodged by any random fire, the attack must be made and maintained by clear and consistent proofs, that although the deed is absolute in form it was otherwise intended in fact. The presumption, that the title is in conformity with the deed, is, as it should be, a strong one, and cannot be overcome, except by satisfactory and clear evidence to the contrary.

The legal title to lands ought not to be exposed to the peril of a successful attack, excepting where the right in equity is clearly established. In this case it has been shown that the purchase money was paid by John Hill, the husband, whilst the title was, by his direction, taken in the name of Elizabeth Hill, his wife. The mere payment of the purchase money, however, under such circumstances, cannot raise a resulting trust in his favor. "Where a husband, who is solvent, purchases property in his wife's name, though he pay his own money, it is hers; there is nothing in the transaction to raise a resulting trust:" Underwood *v.* Warner, 4 Phila., 6. The presumption of trust does not arise, where, from the relation of the parties, we may fairly assume that the purchase was made in the discharge of duty, or from motives of natural love and affection; a husband owes to his wife not only affection, but maintenance and support, and from such a transaction as this the law primarily presumes that the husband intended to settle so much of his estate upon his wife, rather than that she should become a trustee for his use. It is certainly true that, as in other cases, the trust, if any exists, results solely from the payment of the purchase money; no express trust can be established by parol, yet that payment must appear to have been made with the clear understanding and intention that a trust shall exist. This may appear from the attending circumstances, or from the acts or declarations of the parties at the time of the purchase, but it must be shown by evidence which is clear, explicit, and unequivocal. The presumption of gift, it is true, is but a presumption of fact, which determines the burden of proof. Yet, as the effect of the rebutting evidence may be to fasten a trust upon the legal title, it must, for that reason, conform to the measure stated; every element essential to the existence or creation of a resulting trust, in any given case, must be clearly shown. This rule grows out of the policy pursued under the statute of frauds, and its enforcement is essential to the secure enjoyment of real property. We cannot distinguish between the measure of proof required to rebut the ordinary presumption arising from the face of the deed to Elizabeth Hill, and the presump-

tion of gift arising from the relation of the parties, where the purpose is to set up a resulting trust against the legal title. Resulting trusts, although reserved out of the statute of frauds, are in conflict with the sound principles upon which that statute is based [Strimpfler *v.* Roberts, 6 Harris, 298], and when one voluntarily places his rights to real property in such a plight that he can only establish them by an attack upon the written legal title, through the instrumentality of merely oral evidence, he cannot complain if he is held to that uniform measure of proof which will secure adequate protection against the effects of fraud and perjury, and especially so if he choose as the custodian of the title his wife or child, to whom he occupies a relation of especial duty and obligation, and in whose favor presumptions of peculiar force must necessarily arise.

In Roberts' Appeal, 4 Norris, 87, which was affirmed upon the opinion of the court below, Judge THAYER, in speaking of trusts which arise from the payment of purchase money, said : " The presumption of such a resulting trust is always rebutted where, to use the language of the books, 'the purchase may be fairly deemed to be made for another from motives of natural love and affection.' Thus a purchase in the name of a wife or of a child, is uniformly held by the unaided force of the relationship alone, to rebut the presumption, unless there be clear evidence to show the donee was intended to be a mere trustee." In a long line of cases it has been held that to establish a resulting trust the evidence must be clear, explicit and unequivocal ; the rule is so well established that a citation of the authorities, in extenso, seems unnecessary. We may refer, however, to McGinity *v.* McGinity, 13 P. F. S., 38 ; Nixon's Appeal, Id., 279 ; Lingenfelter *v.* Richey, 12 P. F. S., 123 ; Kistler's Appeal, 23 P. F. S., 393 ; Fricke *v.* Magee, 10 W. N. C., 50 ; Buchanan *v.* Streeper, 11 W. N. C., 434.

Whether, therefore, a trust is deducible, in any given case, from the nature of the transaction, as a matter of actual intent, is susceptible of oral proof ; but he, who alleges the trust, takes the burden of establishing it, and all the essential requisites of that trust must be shown by clear, explicit and unequivocal proof. Does the evidence in the case at bar conform to this standard ? We think it does not. It must be observed, upon a full examination of the testimony taken in support of this alleged trust, that it is not only vague, inconsistent and conflicting in its details, but also involved and inconclusive in its effect. Besides, it is seriously contradicted and shaken by the testimony taken on the other side. If we were to conclude, as matter of fact, that a trust was intended,

it would be most difficult to determine its terms. If the testimony of White, Fuller and Brennan establishes or tends to establish anything it is that Elizabeth Hill was the mere trustee for her husband, that she had no beneficial interest whatever in the property, and that she was the mere custodian of the legal title for his benefit. Their testimony is meagre in details, loose, and unsatisfactory as to time, but it tends to show this or it shows nothing.

The only other witness in the cause called to testify as to facts in support of this trust, is John Hill, the appellee, whose incompetency, and that of the appellant, was waived. He repudiates this theory of the case in emphatic language. He says: " The title was put in my wife's name by my consent, after explanations from my conveyancer, who said she could not convey without my signature. In every conversation I ever had with Mrs. Hill about the property it was understood that it was to be mine at her death. She agreed to that; she always said, ' Who else ? ' These conversations took place at or about the time of the purchase. There was one conversation previous to the purchase. At the time of making the purchase I said, ' I am going to put the property in your name with the understanding that it would revert to me after your death.' She agreed to that; it was consummated in that way."

From this testimony, taken alone, it would appear that Mrs. Hill, according to the terms of the alleged trust, did have a beneficial interest in the property during her lifetime, at least, and that the legal title was not vested in her for the exclusive benefit of her husband. The testimony of John Hill is also obscure as to time, place and circumstance.

Mary Ann Earnest, the appellant, testified that shortly after they moved into the house Mr. Hill told her, in the presence of his wife that he had " bought the house for Liz. (his wife), and gave it to her as her own ; " that she (the witness) lived with Hill, from 1875 to 1878, and " he always stuck to it," that the house belonged to his wife ; " that he had nothing more than a life estate in it ; " that John wanted some of the rent, but Mrs. Hill told him " the house was hers, she had a right to the rent, he could not have it ; " that he said " all he had in it was a life estate," and when it came into the witness's hands " it should be clean and clear."

· Mr. Joseph T. Richards testified that from 1874 to 1877 he had frequent conversations with Hill concerning this property. He says: " His statements in reference to the house, to me, were that it belonged to his wife, Mrs. Elizabeth Hill ; that he had purchased it and given it to her."

It also appears that until the death of his wife he abstained

from all interference with the property; he neither collected the rents, paid the taxes, nor exercised any other acts of ownership over it.

The testimony, as a whole, is inconsistent, conflicting, contradictory; it cannot, in any sense, be considered clear, explicit and unequivocal, as in such cases the law requires it should be. If any trust was, in fact, intended, we are left in the greatest uncertainty what the precise trust was.

From a part of the testimony we are led to suppose that Elizabeth Hill was clothed with a mere dry trust, the entire beneficial interest being in the husband; from the testimony of the appellee himself, that she had the beneficial ownership during her life only, the interest in reversion being his; from others we learn that he had a life estate, and the reversion was hers; whilst others state that on repeated occasions he acknowledged that he bought the property for his wife, and gave it to her as her own, which latter statements he does not deny having made.

The decree is reversed and the bill dismissed at the costs of the appellee, including the costs in the court below.