## Loeffler's Estate.

*Inheritance transfer tax—Gift of corporate stock from wife to husband—Evidence required to establish gift as against Commonwealth.*

1. Where the issue to be tried is one of the ownership of stock of a corporation between the widow of decedent claiming it as her own, and the Commonwealth claiming inheritance transfer tax, the widow may either submit her claims to the jurisdiction of the court or request an issue to the Court of Common Pleas; and the court will decline to proceed until the claimant has submitted herself to its jurisdiction.

2. Her interest being adverse to that of the estate of her husband, she is not a competent witness to prove her claim.

3. Where, on the trial of such an issue, it appears that the widow, during her marriage, transferred all her stock in certain corporations to her husband upon the corporate books, it is incumbent upon her to establish the existence of a trust consistent with the legal title in decedent by evidence which is clear, precise and indubitable; in other words, by evidence of the same character as is required to establish the parol modification of a written instrument or a parol trust.

Gest, J., and Lamorelle, P. J., concurred in the first two paragraphs of the above syllabus, but dissented from the third, upon the ground that where a wife transfers her property to her husband without consideration, a presumption arises of an implied trust in her favor, and the burden of proof is on the husband, or, in the case at bar, on the Commonwealth claiming through him, to show that the transfer was intended to be an absolute gift.

Exceptions to decree upon appeal from appraisement and assessment of inheritance transfer tax. O. C. Phila. Co., July T., 1921, No. 365.

The opinion of the hearing judge (Henderson, J.) was as follows:

"This is an appeal by Henrietta Loeffler, individually and as administratrix c. t. a. of Arthur Loeffler, deceased, from the appraisement and assessment for transfer inheritance tax on 510 shares of the R. J. Ederer Company stock, at $500 per share, $255,000; on 1275½ shares of the R. J. Ederer Thread Company, at $114 per share, $145,407, and on 160⅔ shares of the R. J. Ederer Net and Twine Company stock, at $255 per share, $36,150.

"The petition for the appeal alleges that the decedent was not the owner of these shares at the time of his death, but that until shortly before his death held them in trust for Henrietta Loeffler, to enable him to manage the several corporations; that the petitioner was at all times the equitable owner, and' that said shares were turned over to the petitioner by the decedent shortly before his death.

"Upon these allegations, issue was joined and the appellant presented her testimony, none being offered by the Commonwealth.

"It will be observed from the petitioner's allegations that she seeks to avoid the tax by claiming adversely to the estate the title to these stocks. Preliminary to the imposition of the tax, we must first determine the question of ownership. On this question the appellant could either submit her claims to the jurisdiction of this court or request an issue to the Court of Common Pleas. I, therefore, declined to proceed with this appeal unless the determination of the question of ownership was submitted to my jurisdiction. The issue was submitted to my jurisdiction, the appellant being granted an exception to my ruling.

"Objection was made to the calling of the widow in her own behalf, because she was claiming, adversely to the estate, the title to these stocks. I sustained the objection. It was contended that her claim was not adverse, because, if the appeal did not succeed, she would also be the owner as legatee under the will. This merely begs the question. She must rescue the title from the estate or the tax is due; hence, her interest is adverse to the estate. The

2 D. & C.

decedent's rights have passed by his will to a party, or, perhaps, I should say, parties on the record, who represent his interest: Waugaman *v.* Henry, 75 Pa. Superior Ct. 94. Suppose the estate is insolvent, could it be said her claim is not adverse? The mere fact that she takes these stocks as legatee does not render her claim any the less adverse; if a legatee, she only can take after all other claims against the estate have been satisfied. The fact that she, as administratrix *c. t. a.*, agrees with herself individually that the claim is not adverse, does not make it so. . . .

"There is but one issue to be considered—Was the decedent a trustee of this stock for the appellant? If he was, the appeal should be sustained, otherwise dismissed.

"Before examining this question, it should be remarked that the two minor companies were offshoots of the parent company, R. J. Ederer Company, and the stock in these two was merely issued *pro rata* to the record stockholders in the parent company, and it was agreed that the question as to whether the stock in these two companies was held in trust should depend upon the character of the holding of the stock in the parent company. In other words, if that stock was in trust, then these would also be in trust, and *vice versa*.

"We come now to the real issue in this appeal—Did the decedent hold these stocks as a mere trustee for the appellant?

"The argument on behalf of the Commonwealth will first be summarized. All of these stocks stood in the name of the decedent at the time of his death. The business of these companies had formerly belonged to Mrs. Loeffler, but the following minutes of two meetings of the board of directors disclosed that she had absolutely assigned the stock to the decedent:

"'(a) Regular meeting of the Board of Directors of R. J. Ederer Company, held at Chicago, Illinois, on the 5th day of January, 1901, at 1 P. M. Present—Henrietta Loeffler, A. E. Ederer, L. B. Ederer. Henrietta Loeffler stated that she had transferred to her husband, Arthur Loeffler, in consideration of $100 to her in hand paid by him, one share of the capital stock of the R. J. Ederer Company, on condition that the said Arthur Loeffler shall be bound, upon the repayment of the said $100, to reconvey the said share to the said Henrietta Loeffler at any time when she may so elect.'

"(b) Under date of March 2, 1901. 'Meeting called to order by Henrietta Loeffler at 1 P. M.; all directors present except Carl Strover. Henrietta Loeffler stated that, in consideration of the payment to her of $100 and for other good and valuable considerations, she has absolutely and unconditionally sold, transferred and assigned to her husband, Arthur Loeffler, all her shares to the capital stock of the R. J. Ederer Company; that is, the one share transferred to him conditionally on Jan. 4, 1901, as well as the 250 shares still remaining to her after the said conditional transfer, and that the right and title to all the shares to the capital stock of said company now stands vested as follows: Arthur E. Ederer, 125 shares; Louis B. Ederer, 124; Arthur Loeffler, 251.'

"While it was shown that these minutes were phrased by the decedent, it also appeared that Mrs. Loeffler was present 'and acquiesced.' No one present at these meetings testified impeaching these transfers.

"It appears that Henrietta Loeffler had been president of the R. J. Ederer Company, and that she presided at the meeting of the board of directors at which these transfers were made, which meeting was attended by all of the directors except one, and that the secretary of the meeting was Louis B. Ederer, a stockholder and her brother. The transfer was openly made and known to all present and has been acquiesced in for years.

Loeffler's Estate.

"Henrietta Loeffler, having disposed of all her holdings in the R. J. Ederer Company, resigned as president of said company, which resignation was accepted by the board of directors. There was no evidence of any one who was present at these transactions that they were other than what they purport to be—an absolute transfer. . . .

"In 1904, Henrietta Loeffler, the appellant, put more of her individual property into the company, and 260 shares were issued to her therefor. In 1909, she absolutely assigned these to the decedent and the tax has been assessed on them.

"The Commonwealth also laid stress on the fact that all dividends, as well as accretions on these stocks, were paid to Arthur Loeffler, the decedent, and by him applied to his personal account, and this running over a period of about twenty years until his death. . . .

"Her contention will now be briefly summarized. The original property forming the basis of the parent company was undoubtedly hers at the time of marriage; she contends that these shares of stock were transferred to her husband in order to control the company and to conserve his dignity, and it is contended that he had no beneficial interest in the stock and never claimed to have such, and that he frequently admitted that he did not have such interest, and that by reason of the relation of the parties, there was a resulting trust, and, further, that sometime before his death, he made a transfer of these certificates to Mrs. Loeffler. I will summarize the testimony which the appellant relies upon in support of her contention that there was a resulting trust.

Louis B. Ederer, the secretary of the parent company, testified that the decedent stated: "Even though Mrs. Loeffler is not the director, nevertheless, she is the boss and her word goes." Mr. Cochran testified: "He asked me to get Mrs. Loeffler to turn over this stock to him. I told him I could not do it, that she held a position in the company where she could keep everything in order, and I would not advise her to turn over the stock. He said it was necessary for him to have the stock, so he could have control of the company, and that he did not consider her brothers able to run the business, and for her protection he wanted the stock turned over to him, so he could protect her interest."

Q. What did Mr. Loeffler say? A. He was very much displeased and told me he thought I was doing wrong. I afterward saw him that week in St. Louis, and he was right angry about it. He said: "You know her brothers were not able to manage the business," and that for her own protection I should have advised her to turn it over. I said it was rather a difficult position to put me in; I was friendly to both sides; I felt as long as she owned a certain amount of stock, she could do better by voting as she felt, either for him or her brothers."

As to the decedent's turning over the certificates of stock shortly before his death, Mr. Cochran also testified: "I don't know at which time they had the conversations, but I remember the last time I saw him—I think it was the last time I saw him—that, before we left to return to Baltimore, he handed Mrs. Loeffler a package in a large envelope, and he said at that time: 'There is your stock; I don't want it,' and afterward, coming down from Wernersville, Mrs. Loeffler showed me the certificate of the R. J. Ederer Company, of Chicago, one of the R. J. Ederer Thread Company, of Philadelphia, and one of the R. J. Ederer Net and Twine Company.

I had a number of conversations with him, and in all those conversations, as far as I can now remember, he never spoke of entire ownership of this stock, but he continually spoke about the fact of it being necessary for him to have title, as having more knowledge of business matters than his wife, or even her brothers; he said it was absolutely necessary for him to have it for his own protection; there was more or less feeling between them; he was afraid to trust Mrs. Loeffler; he said he cared nothing about the stock and was willing to return it to her at any time, and I never remember him saying anything as to entire ownership or partial ownership in the stock.

He said he knew he was better able to look after her interests than she was, and that he wanted control of the company.

2 D. & C.

Loeffler's Estate.

I remember on several occasions he said he was acting as trustee for her and acting for her best interests, and whenever she wanted the stock, any of it, back, she could have it. I remember that very distinctly.

The only thing I remember from his conversation—or judging from his conversation—he felt if he had these certificates made out in his own name or assigned to him, he would protect her interest and he would be perfectly willing to give them back.

Mr. Lowrie, another witness, testifies: "On repeated occasions he (Mr. Loeffler) called me up to take lunch with him, and we spent, on most of these occasions, an hour or two talking over the different troubles in connection with his business. He repeatedly said during these occasions—at least two of which occasions were held in his own office and the rest at a restaurant in Chicago called 'The Perfecto'—he repeatedly said: 'I have got to fight for my wife's interest; I am representing my wife; personally I don't care what happens, but I must take care of her interests; I am not interested from the financial side, but to see that her interests are protected.' He had subsequently and at that time a good deal of trouble with the internal management; he had a lot of friction with her brothers.

And again this witness testifies: "He said, 'my wife must support me; I must get full authority to run this business.'

"He repeatedly said that he was representing his wife; that he was fighting for his wife's interest; that he personally was not interested in the matter from the personal standpoint.

"Somewhat later he stated that he had got control and that the brothers would have to do what he said. He did not have any confidence, and so stated, in the way her brothers were running it."

Mr. Edsall, another witness called by the appellant, testifies: "A. He said he desired his instructions be obeyed, that he had been placed in control of the business and that it was necessary that his orders be closely followed, in order to protect his holdings or rather his wife's interest. Q. Was that the language he used, 'his holdings or rather his wife's interest?' A. That is the way he said it; he said his holdings or my wife's interest."

Mr. Edsall again testifies: "A. 'Edward, we have always been like pals in the office here; as you know, I am here to take care of my wife's interests; it belongs to her, but I want you to follow my instructions; if you will do that, we will get along better together.' Q. What did he say? A. 'While Mrs. Loeffler is now out of office, she is still the boss and you must do as she says.' Q. Did Mr. Loeffler, before the first 251 shares which she transferred to him before she transferred those shares to him, did he say anything to you as to who should hold those shares and why? A. He said he would not have anything to do with the concern unless he could be the boss; that he wanted that stock turned over to him, so that he would not only have the position of the boss, but would have more prestige with the outside public; that is, the people we did business with, when they knew he was the controlling spirit."

Mr. Louis B. Ederer further testified that Loeffler said: "A. 'I am looking after my wife's interest.' "

Mr. Ederer, in referring to Loeffler's endeavor to get the wives of the brothers to transfer their stock, testified: "A. Yes, he remarked—he said that we should have our wives transfer their stock over to us; that women have no right in business. Q. Did he suggest to you that you should buy the stock or anything of that kind, or what did he mean by that? A. No; just simply have them transferred over to our name."

To the foregoing summary of the appellant's testimony, which I have largely quoted from her brief, so as to emphasize the portions which her counsel relies on, I call attention to the testimony of Mr. Cochran, wherein he said:

"Q. Did you have any conversations with him (Mr. Loeffler) concerning the character in which he held his stock in the R. J. Ederer Company? A. On or about 1909—I am not sure exactly as to the date—I was in Chicago, and on a Sunday afternoon I visited Mr. and Mrs. Loeffler at their house. At that time there came on a discussion in regard to the stock which he wanted his wife to turn over to him; his wife asked me—he told me first that he thought, as a good husband, a wife should turn over all her belongings to a husband; there should be just one pile for both of them, and he requested me to advise Mrs. Loeffler to turn over this. . . ."

"The question which I must now decide is whether this testimony is sufficient to overcome the strong *prima facie* case made out on behalf of the admin-

istratrix *c. t. a.*, but brought out by counsel for the Commonwealth. I think not. I find the testimony, on the whole, consistent with the ownership in the decedent. Before his marriage he was a clerk, earning $12 to $15 a week. It was evidently her wish, as well as his, that he become the president of the company; in accepting that office he wanted the dignity which would go with the knowledge that he owned the stock in the company, and, what is more, he wanted to be in a position to control the appellant's brothers, who had been and were interested in the business with her. With his arrival upon the scene of control, there was friction, and a good deal of friction, between him and the brothers. He was determined to have his way and that they should obey him in corporate matters. This is the real key to the conversations detailed by the witnesses. The testimony of these witnesses is to be interpreted in the light of the conflict between the appellant's brothers and the decedent, and not in the light of the relations between the decedent and his wife, the appellant. It was perfectly natural for him to talk about protecting his wife's interest, and, in doing so, that was a mere colloquial expression. One of the witnesses testifies that he was afraid to trust Mrs. Loeffler, and that he cared nothing about the stock, but this was in connection with the friction with her brothers. When he said that he was 'not interested in the matter from the personal standpoint,' this has reference again to the friction with the brothers, whom he was determined to keep in subjection for his wife's sake and probably, it would be fair to add, for his own pride of position.

"When he said, as several of the witnesses testified, that Mrs. Loeffler 'still is boss,' that was only his method of bringing a certain moral coercion to bear upon the brothers.

"When he said, speaking to his wife, 'This is your stock, I don't want it,' he made no effort to assign it to her, and, it will be recalled, the appellant does not claim title by way of a gift. When he said he was acting as trustee for his wife, I cannot, in the light of the facts, construe this to mean other than a moral trusteeship. He believed husband and wife should have 'one pile,' and that he should have possession thereof, and by his will he left it to her.

"Two small facts in this matter stand out, and I see no sufficient answer thereto. The first is in relation to the first transfer of 250 shares of stock, when, in addition thereto, she also released her right in the one share which had previously been transferred to the decedent conditionally, she having reserved the right to have it back at any time upon the payment of $100. If there was a trust, such as is contended, there was no necessity for her releasing her interest in this one share.

"The second fact, which speaks loudly, is the testimony to the effect that all the dividends and accretions to these stocks were paid to the decedent personally and placed in his personal account. If there was any trust relation, such as is contended, we would expect to have found these dividends paid over to the real owner; but such was not the case.

"To overcome a written record, such as we have here, the evidence must be clear, precise and indubitable; that which has been offered does not measure up to this standard.

"I have, therefore, reached the conclusion that the appellant has failed to establish her contention that the decedent held these shares in trust, and, hence, the appeal is dismissed and the assessment of transfer inheritance tax by the Register of Wills is confirmed."

*E. Clinton Rhoads* and with him *Carl Strover* (of the Illinois Bar), for exceptant.

*Charles S. Schofield*, for Commonwealth.

2 D. & C.

### Loeffler's Estate.

GUMMEY, J., Nov. 3, 1922.—Arthur Loeffler died on Aug. 25, 1920, leaving a will, by which he bequeathed his entire estate to his wife, Henrietta Loeffler. The appraiser appointed by the Register of Wills for Philadelphia County appraised for purposes of taxation certain corporate stocks registered in the name of the decedent on the books of the R. J. Ederer Company, of Illinois, the R. J. Ederer Thread Company, of Pennsylvania, and the R. J. Ederer Net and Twine Company, of Maryland. The appraised value of the stocks amounted to $436,557, and, after the allowance of certain deductions, an inheritance tax was assessed in the sum of $8447.20; whereupon Henrietta Loeffler took this appeal and claims that the stock, though registered in the name of her husband, is equitably hers; that he was a trustee for her and was not himself the owner thereof.

As the issue before the court was limited preliminarily to the ownership of the stock, the presiding judge properly held that if Mrs. Loeffler desired him to adjudicate the questions raised, she must submit herself to his jurisdiction; and he was undoubtedly right in refusing to let her testify in support of her claim, because it was adverse to the estate of her husband.

On the question as to the ownership of the stock, the presiding judge found the facts against Mrs. Loeffler, and accordingly he dismissed the appeal and confirmed the assessment of the tax. A majority of the court are of the opinion that the evidence is sufficient to support his findings, and that, therefore, the exceptions should be dismissed. While recognizing that there exists between husband and wife that confidential relation which requires on the part of a husband convincing proof that in a transaction between them she acted freely and intelligently and with a thorough understanding of the transaction and of its consequences, it is to be remembered that in the present instance the transfer of the stock by Mrs. Loeffler to her husband was a free and voluntary act on her part; she was under no mental disability, and, under the state of facts developed at the hearing, she must have had full knowledge of the circumstances. The transaction is without the slightest taint of fraud, accident or mistake, nor is there an allegation of undue influence, such as was present in Darlington's Appeal, 86 Pa. 512; and in Morrish v. Morrish, 262 Pa. 192, urged upon us by counsel, the wife's case was stronger than the case at bar; the husband was living, and the rights of a third party, to wit, the Commonwealth, had not intervened. Granting, for the sake of argument, that because of the existence of a confidential relation the burden of proof rested, in the first instance, upon the Commonwealth, there is, in our opinion, sufficient in the evidence to shift the burden. As showing Mrs. Loeffler's intention to make her husband the absolute owner of the stock, particular attention may be called to the following: As to the one share which Mrs. Loeffler transferred to her husband in trust; she released the trust; the dividends on the stocks transferred to Loeffler were not only paid to him, but were also retained by him. In 1901, thirteen days after the second transfer of stock, Mrs. Loeffler and her husband executed a joint will, in which it was provided: "In case either of us should survive the other, all our property, real, personal and mixed, shall go to the survivor." At this time Mrs. Loeffler had an interest in R. J. Ederer & Co., a copartnership, and her husband was the owner of 251 shares in the R. J. Ederer Company, so that each acknowledged some sort of ownership in the other, to which the survivor was to succeed; and if, as argued, the purpose of giving the decedent a paper title was to confer control upon him and dignify his position, this theory would seem to fail as to the 260 additional shares issued to Mrs. Loeffler in 1904, and which she did not transfer to him until 1909. Again, the result of the transfer of the stocks to

the decedent was to place him in a position where, if she died first, it would not be necessary for him to account to her estate; while, on the other hand, in the event that he died first, their joint will protected her. This negatives the thought that at the time of the transaction the parties contemplated establishing a trust relationship.

Mr. and Mrs. Loeffler were childless. Had she predeceased him, intestate, he would have been free from the obligation to will her the stocks.

The exceptions are dismissed.

GEST, J., dissenting.—I regret that I am obliged to dissent from the opinion of the majority of the court in this case.

The record shows that the appraiser appointed by the Register of Wills appraised as the property of Arthur Loeffler certain corporate stocks registered in his name on the books of the R. J. Ederer Company (of Illinois), the R. J. Ederer Thread Company (of Pennsylvania) and the R. J. Ederer Net and Twine Company (of Maryland). The total appraisement was $436,557, and, after the allowance of certain deductions, the tax was assessed at the rate of 2 per cent., the decedent having by his will bequeathed his entire estate to his wife. From this appraisement and assessment of tax, amounting to $8447.20, an appeal was taken by Henrietta Loeffler, the widow, who claimed that the stock, though registered in the name of her husband, was equitably hers, in that he was a trustee for her and was not himself the real owner.

At the hearing of the appeal, the presiding judge held, first, that the issue to be tried was one of ownership of the stock, and that the widow, who claimed it as her own, must submit herself to the jurisdiction of this court; secondly, that her interest being adverse to that of the estate of her husband, she was not a competent witness to prove her claim. In these respects, the rulings of the presiding judge were clearly correct, but on the merits of the controversy, I think he was wrong.

The judge who presided at the hearing of the appeal, having considered the evidence adduced before him, held, in brief, that it was not sufficient to overcome the title of the decedent arising from the written record thereof, in that it was not clear, precise and indubitable, and, accordingly, the appeal was dismissed and the assessment of the tax was confirmed.

It is, of course, well settled that the findings of facts made by the judge of the first instance, in the ordinary case of conflicting testimony, are entitled to the same weight as the verdict of a jury, even if another judge might have come to a different conclusion upon the same evidence. This rule, from which I have not the slightest intention to depart, is, however, subject to the qualification that the testimony must conform to such a standard or possess such a character as will, according to its subject, justify the findings. Thus, in Gerofsky's Estate, 25 Dist. R. 472, where the question concerned an alleged delivery by the decedent of a policy of insurance, either as a *donatio mortis causa* or a gift *inter vivos*, the auditing judge found, on the weight of the testimony, in favor of the donee. We sustained exceptions to his finding on the ground that the testimony did not conform to the standard of proof required by the decisions of the Supreme Court, in that it was not clear and satisfactory upon every point essential to the title, or, as some of the decisions express it, "clear and precise," or "clear and convincing."

So, in the present case, the judge who heard the appeal weighed the evidence, as I have said, in the light of the rule that he who undertakes to overcome a written record must do so by clear, precise and indubitable testimony, whereas, in my opinion, he should have considered the evidence according to

the doctrine established by the decisions, viz., that where a wife transfers her property to her husband without consideration, a presumption arises of a resulting, or rather a constructive, trust in her favor, and the burden of proof is on the husband, or, in this case, the Commonwealth claiming through him, to show that the transfer was intended to be an absolute gift. It is not necessary that the transfer be tainted with fraud. The trust arises from the confidential relation and the absence of a valuable consideration.

Among the cases in which this general principle has been enforced are Darlington's Appeal, 86 Pa. 512; Darlington's Estate, 147 Pa. 624; Corrigan v. Conway, 269 Pa. 373; Matthaei v. Pownall, 235 Pa. 460. Where, indeed, the position of the parties is reversed and the husband procures the title in the name of his wife, the presumption is that he intended a gift to her: Earnest's Appeal, 106 Pa. 310; but we are dealing here with a transfer from a wife to her husband without consideration.

As soon, therefore, as it appeared, as it did in this case, that the transfer was made by the wife to the husband without consideration, the presumption arose that he took title as her trustee, and the testimony which might be insufficient to fasten the trust on him, if he were a stranger, will strengthen the presumption of a trust in favor of his wife.

Henrietta Ederer had been engaged since the year 1883, in the City of Chicago, in the manufacture at first of hammocks, afterwards of fish nets and netting. The business was small in the beginning, and her original capital, derived from her father, was insignificant, but the enterprise was very successful. Her two brothers became associated with her in the business, Henrietta Ederer being entitled to 3/5ths interest, and in 1899 the partnership was incorporated, and Henrietta Ederer became the majority stockholder. In 1900, shortly after the incorporation, Henrietta Ederer married Arthur Loeffler, who had no property of his own and was then a clerk in the office of the company, serving half-time in a subordinate capacity at a weekly wage of $12 or $15. Mrs. Loeffler had her stock in the company issued in the name of her husband, and did the same with her stock in the branch companies, established in Baltimore and Philadelphia, under the names of R. J. Ederer Net and Twine Company and R. J. Ederer Thread Company, in each of which she owned the majority and controlling interest. All of these stocks continued in the name of Arthur Loeffler until his death, and are the subject of the present assessment.

Now, the testimony of disinterested witnesses shows that when Henrietta Ederer, a woman of substantial means, married Arthur Loeffler, who had nothing, she desired to put him at the head of her company, and at his solicitation transferred her registered ownership of its stock to him in order that his dignity and importance in the company might be enhanced and that he might have the legal right to control her brothers, with whom some friction appears to have arisen.

Arthur Loeffler paid nothing to his wife for these stocks, which constituted practically her entire estate; he never claimed to be the beneficial owner of them; he always said that his object was to protect his wife's interests; that she was "the boss and her word goes;" that he was her trustee and was not personally interested, and that he was willing to return the stock to her. Shortly before his death, he handed Mrs. Loeffler an envelope containing the certificates, and said, "There is your stock; I don't want it." This need not be considered as a reassignment of it, under the Act of May 5, 1911, § 9, P. L. 126 (Uniform Stock Transfer Act), but I consider it as strongly corroborative of the trust relationship of Arthur Loeffler.

Loeffler's Estate.

The judge who heard this appeal attached great importance to the minutes of the directors' meeting of the R. J. Ederer Company of Jan. 5, 1901, at which Henrietta Loeffler stated that "she had transferred to her husband, Arthur Loeffler, in consideration of $100 to her in hand paid by him, one share of the capital stock of the R. J. Ederer Company, on condition that the said Arthur Loeffler shall be bound, upon the repayment of the said $100, to reconvey the said share to the said Henrietta Loeffler at any time when she may so elect." And also the minutes of the directors' meeting of said company on March 2, 1901, according to which Mrs. Loeffler stated that, "in consideration of the payment to her of $1 and for other good and valuable considerations, she had absolutely and unconditionally sold, transferred and assigned to her husband, Arthur Loeffler, all her shares to the capital stock of the R. J. Ederer Company; that is, the one share transferred to him conditionally on Jan. 4, 1901, as well as the 250 shares still remaining to her after the said conditional transfer, and that the right and title to all the shares to the capital stock of said company now stands vested as follows: Arthur E. Ederer, 125 shares; Louis B. Ederer, 124; Arthur Loeffler, 251."

The judge who heard the appeal, therefore, held that to overcome the record of the directors' meeting, the evidence must be clear, precise and indubitable, and that which was offered did not measure up to this standard. I cannot see, however, that those recitals in the minutes of the directors' meeting affect in any wise the trust assumed by Arthur Loeffler. It was merely a formal method of having it appear in the minutes that Arthur Loeffler, as registered owner of the majority of the stock, was in control of the corporation, which was the object of the only two persons who were interested.

The judge who heard the appeal also laid stress on the fact that, when Mrs. Loeffler transferred to her husband the 250 shares of stock, she also released her rights in the one share previously transferred to him conditionally, she having then reserved the right to have it back at any time upon payment of $100. The argument is drawn from this, that if there was a trust, such as is now contended, there was no necessity for her releasing her interest in this one share. But there is no inconsistency arising from this; the object of Mrs. Loeffler was simply to vest the legal title to all of her stock in her husband, and she, therefore, did not wish it to appear on the minutes of the corporation that this one share of stock stood in any different position from the rest. So far as the corporation was concerned, Arthur Loeffler held the legal title; but that is entirely consistent with his trusteeship, for a trustee should hold, and always does hold, the title.

Stress is also laid on the fact that the dividends on these stocks were paid to the decedent, Arthur Loeffler, or passed to his account. But the dividends were naturally paid to the registered owner and were affected by the same trust. It seems to be admitted that Mrs. Loeffler possessed no other property than the stocks in these companies; at any rate, these constituted the great bulk of her estate, and it is a necessary presumption, at least a fair one, that she and her husband used this income for their mutual benefit and support. In fact, as Mr. Loeffler said to a witness, he thought there should be just one pile for both of them. And, finally, the fact that the arrangement, whatever it was, continued for so many years without objection on Mrs. Loeffler's part does not militate against the theory of a trust, for the same reasons that induced her action in the beginning continued without change until the end.

Suppose that Arthur Loeffler, instead of living amicably with his wife until his death, had deserted her, or claimed to be the beneficial owner of this stock, and she had brought suit against him to recover it, as she might have done:

2 D. & C.

Schomaker *v.* Schomaker, 247 Pa. 444. If, on a bill filed by her, the facts appeared as they have been stated here, a chancellor sitting in equity would not hesitate to decree a retransfer of the stock.

It need only be added that this is not a case where the rights of creditors of the deceased husband are involved. If Arthur Loeffler, on the strength of his ostensible ownership of these stocks, had incurred debts, it might well follow that his widow could not assert her title as against his creditors, Light *v.* Zeller, No. 2, 144 Pa. 582, and likewise his assignee, without notice, could resist her claim; but these questions need not be considered, for they do not arise.

It is, in my opinion, incorrect to say that the rights of a third party, to wit, the Commonwealth, have intervened. The Commonwealth has no rights unless these stocks belonged to Arthur Loeffler, and that is the very point in dispute. To tax her property as though it were his would be most unjust, and virtually penalize a woman for having entrusted her property to her husband's care.

I am, therefore, of opinion that the 1st, 2nd, 5th and 13th to 19th exceptions should be sustained and the assessment of tax set aside.

LAMORELLE, P. J., concurs in this opinion.