# Darlington's Appeal.

1. Where parties have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage, or exercise undue influence over the other, a transaction between persons so situated is watched with extreme jealousy and solicitude; and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party.

2. Such a relation exists between man and wife; and where there are transactions between them, courts will apply the same rules which govern dealings between attorney and client, principal and agent, guardian and ward, trustee and *cestui que trust,* and will require, when the husband claims a benefit arising from any such dealings, that it be shown affirmatively that he acted in perfect good faith, and took no advantage of his influence or knowledge, and that whatever contracts he made, were fair, adequate and equitable. If no such proof is established, courts of equity will avoid his contracts on the ground of constructive fraud.

3. The conveyance of a wife's estate for her husband's use will be held void, unless it affirmatively appears from the attending circumstances, or otherwise, that it was her voluntary act, and not induced by undue influence.

4. The certificate of a magistrate to the acknowledgment of a deed of her separate estate by a married woman to her husband, will not avail, where innocent purchasers have not intervened, to prevent her heir from avoiding the deed on the ground of undue influence on the part of the husband.

5. Where a bill in equity is inartistic and incomplete, but has substance by which to amend, if necessary, amendment will be allowed in the Supreme Court.

[Darlington's Appeal.]

6. Where a bill in equity is filed to enforce compliance with an award, and it appears that a married woman had not been joined by her husband in the submission to the arbitrators, and was not therefore bound, the court will nevertheless grant appropriate relief, if the complainant's bill discloses substantial grounds therefor.

March 28th 1878.　Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON WOODWARD and TRUNKEY, JJ.

Appeal from, the Court of Common Pleas, of *Chester county :* Of January Term 1878, No. 172.　In Equity.

This was a bill in equity, filed by Jacob H. Darlington against Job Darlington, Franklin Darlington, Hoopes Darlington, Sidney D. Pennock, Samuel Dixon and Hannah J. Dixon, his wife, to compel them to pay to him the value of a certain farm in Chester county, according to an award made by certain referees mutually chosen by the parties, or to convey and release to him, all right, title and interest, in the said farm, and also to pay to him the sum of $1000 and interest, according to said award, and six months' rent of said farm.

The facts were substantially as follows :

Joshua H. Darlington, the complainant, is the only son of Joshua and Martha T. Darlington, who were married in September 1841. She was the second wife of her husband.　By the first, he had five children named in the bill—Job, Franklin, Hoopes, Sidney and Hannah.　The last is intermarried with Samuel Dixon.　At the time of her marriage, Martha was about thirty-six years of age, and she was the owner of a farm of about seventy acres of land, near West Chester, and a lot of ten acres of woodland besides. Within less than two months after her marriage, she joined her husband in a conveyance of all her real estate, to John H. Brinton, Esq., for the consideration of one dollar, and he, at the same time, for the same consideration, conveyed the property to Joshua Darlington.　In these conveyances, a life-estate was reserved to Martha. The deed was acknowledged before a justice of the peace.　In reference to the conduct of Martha at the time of the acknowledgment, a witness, who was present, testified : "I, of course, observed her manner; I don't think she said anything, except to answer the queries put to her ; she signed when asked to sign, or when the paper was presented to her, without any hesitation, but I don't remember anything in her manner that was particularly striking, except this : that while she signed without hesitation, I thought she was brought to that act with some reluctance.　She seemed not to be cheerful in what she was doing; she seemed reluctant."

The deeds were not recorded until January 2d 1868, their existence having been kept a secret because it was feared an old aunt of Martha's, who was living with Darlington and his wife, "would be disturbed and uneasy if she knew of the transaction."

[Darlington's Appeal.]

Shortly after his marriage, Joshua Darlington also reduced all his wife's choses in action to possession.

On December 9th 1863, the ten-acre piece of woodland was conveyed by Joshua Darlington and wife, to John Noble, in fee, for $1000, and the purchase-money paid to the husband, which he appropriated to his own use.

Martha Darlington died in the month of March 1872. She is alleged, in the bill, to have been a woman of weak mind, easily influenced, and always in poor health.

Joshua Darlington died November 8th 1872.

Soon after his death, this controversy arose: Jacob H. Darlington, as the only child of his mother, claimed the farm that had belonged to her, and the value of the wood-lot. The claim was resisted, and all the parties, including Mrs. Dixon, her husband, however, refusing to unite with her, agreed to submit all matters in variance as to the distribution of the estate, to referees, who should "hear the parties, their proofs and allegations, and determine and award what proportion of said estate equitably belongs to each of the said children—the said farm for this purpose, to be considered as the property of Joshua Darlington, deceased." The referees sat on the case, heard the parties and made an award.

By that award, made March 2d 1873, they determined that the farm, worth in their judgment, $18,000, equitably belongs to Jacob H. Darlington, and they awarded the same to him, or $18,000 of the estate of the said Joshua Darlington in lieu thereof, and $1000, the proceeds of the sale of said wood-lot, and also, half the rent of the farm for the year ending April 1st 1873, and interest on the said $1000 for six months, up to April 1st 1873—and further, that the said Jacob is entitled to retain, without accounting to his father's estate, whatever money, property and securities were handed him by his father after his mother's death, out of her chest.

They also awarded, that all the other real and personal estate of the said Joshua Darlington, equitably belongs to the other children, exclusive of the said Jacob, to be divided amongst them equally, and that the said Jacob should pay one-half of the expenses of the reference, and the other parties the other half.

Soon after the award was rendered the complainant supposing the award would be complied with without objection, took possession of the farm, and the title-deeds, so far as they were in possession of the father, were placed in his hands; and he requested the other parties to the award, including the said Hannah, to release to him. They refused to do so. He thereupon called upon them to elect whether they would yield to him the farm, or pay to him the value, as found by the referees, $18,000; he offering to release all his interest to them, on payment of that sum. They refused to elect. He then elected to take the $18,000 in lieu of the farm.

[Darlington's Appeal.]

This bill was then filed to compel the parties to perform their part of the award, and was referred to a master, who reported that the award was binding on all parties except Hannah J. Dixon; that she being a married woman was not bound by it, although she signed the submission, attended before the referees, and took part in the contest; that the respondents having refused to elect, the complainant was entitled to elect, and having elected to take $18,000 in lieu of the farm, he recommended a decree in favor of the complainant for four-fifths of that sum with interest, and also for four-fifths of the sum of $1000, with interest. He further reported the complainant was not entitled to recover any rent of the farm for six months prior to the 1st of April 1873, the amount of the said rent having been left uncertain.

To this report exceptions were filed by both parties.

The complainant objected to the report.

1. Because the auditor had decided that the award was void as to Hannah J. Dixon, and that the title to the farm and wood-lot were legally vested in Joshua Darlington by the conveyances.

2. Because he had not decided that the conveyance by Martha Darlington, of her real estate to her husband, under the circumstances and taken in connection with her mental imbecility, were prima facie evidence of undue influence on his part.

3. Because he had not reported that the award of arbitrators ought to be sustained in all particulars.

4. And because he had decided that the award, as respects the rent, was uncertain and void.

The respondents, inter alia, objected to the report:

That the master ought to have concluded, that the award did not conform to the submission; that he ought to have found the award not final and decisive, and therefore incapable of being enforced; that he ought to have found that the respondents had not a full and fair hearing before the arbitrators; that the award being void as to one respondent, ought to have been found void as to all, and incapable of being enforced; that the master ought to have found, that an alternative award like this could not be enforced.

After argument upon these exceptions the court, Butler, P. J., in an opinion, inter alia, said:

"The plaintiff's case (as presented by his bill), is founded on the award alone; whether he could sustain a claim for the farm, independently of it, we need not, therefore, inquire. The question is not before us. We agree with the master, that Mrs. Dixon is not bound by the award. She was incompetent to join in the contract on which it rests. This would be so, we think, even if it did not embrace (as it does), the transfer of land. We also agree with him that the award is nevertheless binding on the other defendants and that its observance should be enforced. Aware of Mrs. Dixon's coverture, they are presumed to know that she was not bound, and

might not perform. With this knowledge they proceeded with the case at great length, involving a large expenditure of time, labor and money, and took the chances of a favorable result. Justice, therefore, requires them to stand by what was done: Summerville v. Painter, 8 Wright 110; Russel on Arbitrators 22, 26, 529, 637." The court then decreed that the award was binding upon all the defendants except Dixon and his wife, and it was ordered that all the defendants except them should make a conveyance of their estate in the land to the complainant. The complainant appealed, and among his assignments of error were the following:

1. The court below erred in deciding that the validity of the conveyance, by which the real estate in the bill mentioned was transferred from Martha Darlington to her husband, was not presented for decision in this case.

2. In deciding that Hannah J. Dixon, one of the defendants below, was not bound by the award, for the specific performance of which the bill in this case was brought.

*Joseph J. Lewis* and *Wayne MacVeagh,* for appellant.—In the execution of these deeds under the circumstances of this case the presumption is that the wife acted under the undue influence and control of her husband: Weeks v. Haas, 3 W. & S. 523; Louden v. Blythe, 4 Harris 539; Drury v. Foster, 2 Wallace 31; Methodist Church v. Jaques, 3 Johns. Ch. Rep. 96; White v. Wager, 32 Barb. 255. Courts are jealously watchful of gifts between persons in relations of trust, dependence and confidence: Milnes v. Busk, 2 Ves. 488; Kurger v. Kurger, 8 Barb. 272; Huguenin v. Baseley, 14 Ves. 273; Stiles v. Stiles, 14 Mich. 75; Witbeck v. Witbeck, 25 Id. 441; McRae v. Battle, 99 N. C. 109; Wilson v. Bull, 10 Ohio 212; Calhoun v. Calhoun, 2 Strob. Eq. 236; Cooke v. Lamotte, 15 Beav. 234; Cobbot v. Brock, 20 Id. 524; Page v. Horne, 11 Id. 235; Swisshelm's Appeal, 6 P. F. Smith 486. It is not an adequate answer to these well-settled principles of law to say that there was a separate acknowledgment of the wife in pursuance of the Act of Assembly, for this court has repeatedly declared that slight importance is to be given to such examinations as are made at acknowledgments: Schrader v. Decker, 9 Barr 14; Louden v. Blythe, *supra.*

The question, therefore, remains, whether a wife of weak mind may be divested of her property by her husband, and the title vested in him by the mere presentation of a deed executed and acknowledged by her, according to the forms of law. The learned court below evaded this question by declaring that it did not arise, as the bill was framed only to secure the specific execution of the award, but it is believed that a very slight examination of the bill will establish the error of this position. The bill sets forth at length the grounds upon which the conveyance in question is

alleged to have been invalid, and distinctly prays, either for a specific performance of the award, or for a conveyance of the apparent right of each of the defendants to the real estate in said conveyance, mentioned to the plaintiff. It is difficult to conceive how the validity of the conveyance could have been more distinctly and clearly raised, or relief from it more distinctly demanded. The plaintiff having offered the defendants the right to elect whether they would convey him the farm, or pay him the purchase-money, and such right of election having been distinctly refused by them, it is believed that it thereupon became his right and privilege to make such election. No other construction of the relative rights of the parties would harmonize the award, and give effect to its alternative provisions in this respect.

Mrs. Dixon was authorized, as a matter of law, to join in the agreement, and is concluded by the submission made in pursuance of it: Darlington's Appeal, 1 Harris 431; McMahan v. McMahan, 1 Id. 380; Willard v. Willard, 6 P. F. Smith 127.

*Abner Pyle*, *William M. Hayes* and *George W. Biddle*, for appellees.—The assumption on the part of Jacob that any right to elect whether he would take the farm or the $18,000 devolved upon him, is the fundamental error in the plaintiff's case. Whenever arbitrators award that the party against whom they decide shall perform either one of two acts, the option of choosing which of the two acts that party will perform lies with the party himself. Where an award is made against a party, he has a right, when a suit is brought against him on the award, to plead performance. This plea, if proved, is a complete bar to such an action. Now, an award against the party in the alternative, gives him a right to plead performance of either alternative, in bar of such action on the award. Jacob has brought suit on the award, and if the defendants were to plead " performance " to the bill and set up that they had conveyed the farm, such a plea would be good under its very terms. But such a plea could not, of course, be good if Jacob had a right to elect that he should have $18,000 instead.

Mrs. Dixon, being a *feme covert* at the time she affixed her signature and seal to the submission, the award was not binding. This submission involves the title to real estate, and the only way a married woman can convey real estate in Pennsylvania is under the Act of 1770, which provides that her husband shall join with her, and her separate acknowledgment be taken in the prescribed form, neither of which requisites were here performed. By the general rule of the common law, the sole submission of a *feme covert* is void: Morse on Arbitration and Awards 27.

There was no evidence before the court below to show that Mrs. Darlington was incompetent to execute the conveyance of the 8th of November 1841. Whatever the law may be in other states, in

Pennsylvania Mrs. Darlington had a perfect right, if she chose to do so and understood what she was doing, to transfer her property in the manner mentioned, to her husband. All the authorities in this state show that where the requirements of the Act of 1770 are complied with, a prima facie title in the grantee is shown. It is true that in many cases this court has expressed its opinion that great importance is not to be attached to the examination of the wife in pursuance of the Act of Assembly, but it is always where the prima facie presumption of the acknowledgment is overthrown by rebutting testimony. The only evidence that the plaintiffs attempt to adduce is of duress and undue influence. This evidence, as stated by the master, wholly fails to prove these allegations. The master before whom it was adduced so finds. The only other competent evidence to avoid the deed would be of legal incapacity to make the contract. But Mrs. Darlington was married in September 1841. No change whatever in her mental condition is alleged to have taken place between September 1841 and November 1841, two months later. If, therefore, she was competent to enter into the contract of marriage, she was certainly competent to enter into the much less important one, of conveying property to her husband.

Mr. Justice TRUNKEY delivered the opinion of the court, May 6th 1878.

An act or contract, though not originating in any evil design or contrivance to injure another, yet tending to deceive and mislead, or violate private confidence, is a constructive fraud, equally reprehensible with actual fraud, and prohibited by law. Constructive fraud often exists where the parties to the contract have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage of, or exercise undue influence over the other. Wherever, from such relation, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself. A transaction between persons so situated is watched with extreme jealousy and solicitude, and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. Owing to the near connection between the parties, in many relations, the transaction in itself is considered so suspicious as to cast the burden of proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious. For instance, the relation between attorney and client gives rise to great confidence and to very strong influences by the attorney over the actions, rights and interests of his client. The attorney is presumed to have the power to gain by the necessities,

[Darlington's Appeal.]

good-nature, liberality and credulity of his client, and to obtain undue advantages, bargains and gratuities. Hence the law often interposes to declare transactions between them void, which, between other persons, would be unobjectionable. This doctrine is said to rest upon the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties. The principle, that while the relation of client and attorney subsists in its full vigor, the latter shall derive no benefit to himself from the contracts, or bounty, or other negotiations of the former, supersedes the necessity of any inquiry into the particular means, extent and exertion of influence in a given case, a task often difficult and ill-supported by evidence, which can be drawn from any satisfactory sources. On the one hand, it is not necessary to establish that there has been fraud or imposition upon the client; and, on the other hand, it is not necessarily void throughout, *ipso facto*. But the burden of establishing its perfect fairness, adequacy and equity is thrown upon the attorney. If no such proof is established, courts of equity treat the case as one of constructive fraud. In dealings between principal and agent, or guardian 'and ward, or trustee and *cestui que trust*, the same principles prevail, with a larger and more comprehensive efficiency; and the burden of proof is upon the agent, the guardian, or the trustee, who claims a benefit arising from the transaction, to show the utmost good faith on his part, that he took no advantage of his influence or knowledge, and that he brought everything to the knowledge of the other party which he himself knew.

The foregoing principles are too familiar for citation of text-book or report. It is equally unnecessary to show by authority that the most dominant influence of all relations is that of the husband over his wife. From the proud and untutored savage to the cultured and refined Anglo-American, the wife is affectionately anxious to please her husband. This is first in her heart, whether she be in the menial service of a rude hut, or in daily toil for support of her family, or in charge of an elegant mansion. When he commands, she obeys; when he persuades, she yields; when he gently hints a wish, she grants. When treated almost as a servant—when governed and corrected as a child, as did our sturdy ancestors—or when confided in as a companion and equal, her will is subdued to her lord. True, there are exceptional women, whose nature is unaffected by marriage, who cannot yield or bend, and, as wives, would not be happy, save with effeminate husbands; but these are not so numerous as to cloud perception of the mental and moral differences of the sexes. The common-law rights and disabilities, consequent on marriage, grew out of these differences, and the husband's power and influence distinctly appear. "By marriage, the husband and wife are one person in law; that is, the very being or legal existence of the woman is

[Darlington's Appeal.]

suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection and cover, she performs everything; and is, therefore, called in our law-french a *feme covert, fœmina viro co-operta ;* is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.*" One of the reasons for suspension of her legal existence is said to be " for her own security in guarding her against her husband's influence over her by disabling her from disposing of her own property." The disability to dispose of her own property, of course, related to her land, which she or her heir could hold and enjoy after the end of the husband's estate therein. By marriage, he became entitled to all his wife's personalty and the use of her lands. Under advancing culture and civilization, modern legislation has materially changed the common law respecting the rights and disabilities incident to the marriage relation. In Pennsylvania, the wife may hold and enjoy her own property, and easy modes are provided for her disposal of it. But the unity of person remains, resting on a foundation older than the common law, and the husband's influence over his wife, so strongly expressed by the common-law writers, will end only with the marriage relation itself. The unfeeling greed, that, in a less refined age, transferred all the wife's personal property and the use of her real estate to her husband, is not entirely extinct. Many a husband, in all sincerity, believes the common-law rule better than the statute, for the former accords with his avarice. Such an one, as well as one who cares not for right, is inclined to get control of his wife's property; and to that end, if she does not readily and quickly yield, will subject her to like importunities as sent Martha Darlington weeping and asking advice; yet, in a little time, against the advice, compelled her to make a deed, acknowledged in due form, vesting her estate in her husband. Surely, if anywhere, the rule that he who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence, and that the arrangement is fair and conscientious, should be applied in a case where the wife conveyed her property to her husband.

In Weeks *v.* Haas, 3 W. & S. 520, GIBSON, C. J., said, in speaking of husband and wife : " Her dependence on him is more entire than the dependence incident to any other of the domestic relations; and the law relaxes its grasp on no means within its power to prevent him from misusing it. When it is her purpose to give him her land, the accomplishment of it by means of a conveyance to a convenient friend cannot be prevented, yet the step is so obviously the consequence of the husband's avarice, that it is seldom to be commended." When it is truly her purpose to give him her land it ought not to be prevented. But in determining if that was her purpose, when the step is obviously the consequence of her husband's avarice, will a rule of

proof be adopted less favorable to her than to a client who dealt with his attorney, or to a principal who dealt with his agent? Ought not the rule to be more strictly adhered to as the relation is closer and more confidential? or as the one party is stronger and the other weaker?

The same great judge said, in Watson v. Mercer, 6 S. & R. 49.: "The subordinate and dependent condition of the wife, opens to the husband such an unbounded field to practice on her natural timidity, or to abuse a confidence, never sparingly reposed in return for even occasional and insidious kindness, that there is nothing, however unreasonable or unjust, to which he cannot procure her consent. The policy of the law should be, as far as possible, to narrow, rather than to widen the field of this controlling influence. * * * Where the conveyance is to a trustee, for the purpose of an immediate reconveyance to the husband, what honest mind would feel regret, that in the hurry of accomplishment, some circumstance, merely formal, was omitted, by which the wife and her family were rescued from his rapacity? The very circumstances of a reconveyance ought to be satisfactory evidence of fraud by undue influence; and although I do not know that a chancellor would set aside the wife's deed on the same ground on which he interferes to defeat an advantage gained by a parent or guardian, while their influence over the child or ward is supposed to continue, still it ought to induce a court to lay hold of the slightest extrinsic circumstance to effect the same purpose." This dictum, uttered half a century ago in an ejectment, where the parties stood in like relation as in the pending case, and where the deed was held void for defective certificate of the wife's acknowledgment, shows that the judicial mind, observing the fruits of the act of 1770, was aroused to the importance of applying the rules relative to persons holding confidential relations, to transactions between husband and wife. So long as their common-law rights and disabilities were unaffected by statute, there could hardly have been occasion for application of those rules to them; but when statutes secure to married women their property, with right of its enjoyment and disposal, occasions arise when they need and ought to have the full benefit of rules established for the protection of persons, whose relations to others give the latter the power and means of exerting an undue influence over the former. The conveyance of a wife's estate for her husband's use will be held void, unless it affirmatively appears, from the attending circumstances, or otherwise, that it was her voluntary act and not induced by his undue influence.

Coming to the facts of this case: In 1841, Joshua Darlington, aged forty-four years, a widower with five children, married Martha T. Haines, aged thirty-six years. Her father died in 1811, leaving no widow and no other child. From him she inherited the lands described in the bill, except a small lot she purchased before her marriage. She had considerable personalty when married, and her

[Darlington's Appeal.]

husband lost no time in reducing it into his possession, making it absolutely his own. In about two months after their marriage, by procurement of the husband, deeds were prepared, one of which he and his wife executed, for a nominal consideration, conveying all her land to John H. Brinton, reserving to her a life estate; and, immediately, Brinton conveyed the same land to Joshua Darlington. These deeds he kept secret from her friends till 1868. He sold a lot in 1863 for $1000, which he received, and at that time took counsel to enable him and his wife to convey, without revealing the deeds executed in 1841. It is probable as a fact, as well as a legal presumption, that she knew the contents of the deed to Brinton. No act was done or omitted to vitiate the acknowledgment. It seems she was not too imbecile to make a contract, but was dull of hearing, defective in speech, of infirm health, and mentally weak. Her husband rarely permitted her to make purchases, which act is excused by his having absorbed all her personal estate; and, from the day of his marriage, doing nothing but practising economy so as to live on the income of the property derived from his wife. The master says that there is no evidence that he exerted undue influence over his wife to induce her to convey the land. The master thinks that in going to her neighbors, crying, complaining that her husband had got all her money and wanted her to give him the land, and asking advice, and saying she would never give it to him, "only proves that the subject was fully considered by her, and that she had opportunity of consulting with her friends, that she solicited their advice, and that she had resolved at that time not to yield to her husband." Without specially noting the inferences of the master, it is enough that there is no affirmative evidence that it was the purpose of that woman, free from her husband's undue influence, to give him the land, nor that his conduct was fair and conscionable. On the contrary, a weak-minded woman, having no near relations, soon after her marriage, is brought into the presence of her husband's attorney, and of his convenient friend, and of a magistrate; was there a very short time, but long enough to reluctantly convey the legal title of her land to her husband, and there is not a word in support of its fairness but the magistrate's certificate. What is that certificate worth, under the circumstances? As evidence, it has just the value of a declaration made in presence of her husband's friend, and also of his attorney, at the time of the execution of the deed. That deed, acknowledged in due form by the wife, is as open to avoidance for actual or constructive fraud of her husband, as would be the deed of a client, duly acknowledged, for like cause done by his attorney. This is too plain for question.

Here there are no innocent purchasers. The plaintiff is the heir of Martha T. Darlington. The defendants stand in the shoes of their ancestor. They have the bare legal title, but the equitable title is in the plaintiff.

The plaintiff claims the award is valid; and all the defendants, except Samuel Dixon and wife, say, though believing it defective, they have determined to abide by it. Hence, as between them, the award will be treated as valid. The arbitrators say, the farm "equitably belongs to the said Jacob H. Darlington, and they did award the same to him, or $18,000 of the estate of said Joshua, in lieu thereof." The court was right in holding that the plaintiff was entitled to the farm, unless the defendants elected to pay the money.

Samuel Dixon and Hannah J., his wife, are parties to the bill. They repudiate the award, as is their right. They objected to inquiry into such matters of dispute, as were left unsettled, by reason of the invalidity of the award as to her. The master took the testimony and the parties were fully heard upon the merits. The learned judge was of opinion that the case as presented by the bill is on the award alone. In this we think there was error. The bill is not so artistic and complete as is desirable, yet has substance by which to amend; and, if need be, amendment would be allowed here. The learned counsel for defendants waived that formality, if the court were of opinion the bill has substance as against Dixon and wife. The second paragraph, after describing the lands, adds: "which two tracts of land the said Martha was induced by the persuasions and influence of her husband to convey to him." And the fourth avers: "That the said Martha was of weak mind, easily influenced, unacquainted with the forms of business, had little intercourse with society, and little knowledge of her rights of property, and during her whole life infirm in health." In case of refusal to decree a specific performance of the award, there is a prayer for decree that the defendants, including Dixon and wife, convey to the plaintiff the said farm, and pay the said $1000, received by Joshua Darlington for the lot he sold, with interest; and prayer for further relief. The plaintiff is entitled to a decree against all the defendants.

This cause having been argued by counsel, upon consideration the judgment is reversed, and it is adjudged and decreed as follows:—

1. That the defendants, Job Darlington, Franklin Darlington, Hoopes Darlington, Sidney D. Pennock, and Samuel Dixon and Hannah J., his wife, within thirty days after notice of this decree, release and convey unto Jacob H. Darlington and his heirs, all their title and estate in the tract of land, containing about seventy-eight acres, described in the bill, free from encumbrance created by them or any of them.

2. That the said defendants assign and transfer to said plaintiff their respective claims of and in the estate of Joshua Darlington, deceased, to amount of $1000 and interest thereon, from October 1st 1872, being amount of money received by said Joshua on sale of wood-lot described in the bill, in such manner that the administrators of the estate of said Joshua may pay said $1000 and inter-

[Darlington's Appeal.]

est as if a debt owing to said plaintiff, and so that sum, with interest, shall be first paid to said plaintiff before distribution of the estate to the heirs.

3. That the said plaintiff retain for his own use, and shall in no manner be required to account for or pay for any moneys, securities or other things given or handed to him by said Joshua in his lifetime, as respects the said Job, Franklin, Hoopes and Sidney D., and, as against them, the plaintiff's right and title thereto shall be absolute.

4. That said plaintiff, within thirty days after notice of this decree, assign and transfer all his legal and equitable title and interest of and in the four-fifths part of the other real and personal estate of said Joshua Darlington, deceased, to said Job, Franklin, Hoopes and Sidney D., and their heirs.

5. That said Job, Franklin, Hoopes and Sidney D., within thirty days, pay to the plaintiff four-fifths of one-half the rent of said farm for the year ending April 1st 1873, with interest from that date; and, if the parties do not agree upon the amount, a master be appointed to ascertain the same.

6. That the costs of this action, including costs of appeal, be paid by the defendants.

7. That the record be remitted for the execution of this decree.