## Elverson's Estate.

*Philip R. Hepburn* and *Charles J. Hepburn,* for administrator *d. b. n. c. t. a.* and Eleanor Elverson Patenotre.

*Allen Hunter White, R. Sturgis Ingersoll, Boyd Lee Spahr, Ellis Ames Ballard* and *Robert von Moschzisker,* for John Green.

VAN DUSEN, J., June 5, 1931.—James Elverson's will gave $500,000 in trust for his wife, Eleanore Mayo Elverson, for life, with remainder to his sister, Eleanor Elverson Patenotre, and gave the residue to his wife and appointed her executrix.

Eleanore Mayo Elverson died three months later; and her will, after certain legacies, gave the residue to John Green and appointed the Liberty Title and Trust Company executor. Herbert E. Blackman was appointed administrator *d. b. n. c. t. a.* of James Elverson's estate. Because of these relations,

the estates of husband and wife were administered more or less as one, and it is Green who will ultimately, after payment of Mrs. Elverson's legacies, get the benefit, if any, of the residue of the husband's estate. Among counsel appeared our former Chief Justice, whose forcible argument, directed to his client's strongest points, was a great pleasure to us.

### Exceptions of John Green.

1. James Elverson had a margin account at a broker's and a collateral loan at a bank. His debts thus secured were large, and the securities were stocks of a speculative character. Whatever the nature of the stocks, it was the duty of the administrator *d. b. n. c. t. a.* at least to sell enough securities to pay the debts, expenses and taxes and provide for the legacies at once, and to take no chances on the market of the future. That he did not do so was due to the policy of Mrs. Elverson, his predecessor, in her lifetime, and later the requests of Green, her residuary legatee. The findings of the Auditing Judge to this effect are amply supported by the evidence and are approved by us. We shall, therefore, pass over intermediate events until we come to September 16, 1929.

On that day, the administrator informed Green that testator's sister insisted on the sale of stocks so that her legacy might surely be provided for; and also that the creditors might insist at any moment on the sale of securities to pay them. Green then gave written authority and direction to sell the principal stocks at prices substantially below the market at that time, Hudson Motors at 78 and International Combustion at 65. At the same time, as the Auditing Judge in substance finds, he orally stipulated that this authority should not be used unless it was necessary to comply with demands of the creditors, and that otherwise sales should only be made at 85 for Hudson Motors and 72 for Combustion, which was then about the market price. To this we add, with the consent of the Auditing Judge, a finding that Green further directed that the sales should be in small lots, that he said "the less you sell, the better I like it," and that Edwin Gilfillan, an employee in the office of the attorneys for the administrator, was selected by the administrator, with the concurrence of Green, to direct the details of the sales.

The written authority would protect the administrator who acted on it, but its existence would not preclude the existence of other directions. Of course, the question of credibility arises, but that is for the Auditing Judge. The findings are made on the basis of the testimony of four witnesses, three of whom had no money interest, as against the testimony of Green alone, and they are supported by the immediate acts of Gilfillan and by the subsequent acts of Green.

Gilfillan on the two following days "fed out" the stock in small lots and got slightly better than the prices orally stipulated. On those days the volume of sales on the exchange was large. On the next day the volume of sales fell off somewhat, though there were sales at the prices in question. No stock was offered by the estate on this day or thereafter; and presently the price fell below the orally stipulated prices and never came back, and the stock was eventually sold at the prices of the October panic. Nevertheless, as we further find with the concurrence of the Auditing Judge, when the result of the September sales and the failure to make further sales was reported to Green, he expressed approval. He now seeks a surcharge because of failure to make sales of all stocks at the market prices of September 16 to 19, 1929.

Evidence was given by experienced brokers, and not contradicted, that all the stock could have been sold at the orally stipulated prices on the three days before the market broke. But it was a question of judgment as to how fast

the stock was to be offered. Months had passed with very little done; no one then knew that the crash was about to come. Gilfillan (who was selected, with Green's assent, as the man to exercise the judgment, though it does not follow that he was Green's *agent* in the strict sense), says that he was afraid the market would not absorb the stock any faster when "the pool" discovered where it was coming from. We cannot say as a matter of law that it was negligence under the circumstances not to offer all the stock in those two or three days; especially when Green's directions above referred to are considered. Green's exceptions to the refusal of the Auditing Judge to surcharge the accountant for failure to make further sales are dismissed. . . . The foregoing discussion applies both to the stocks which belonged to the husband and to those which belonged to the wife, so far as alleged loss is concerned. The ownership of the latter is the subject of further exceptions.

2. Objections to all commissions to the administrator are based principally on his alleged negligence in selling securities; and as that charge fails, the objections to the commissions—reduced by the Auditing Judge to a reasonable amount—fall too. Green's exceptions 9, 10 and 11 are dismissed.

*Exceptions of the administrator d. b. n. c. t. a. and Eleanor Elverson Patenotre.*

These exceptions are identical. Some of them (as hereafter noted) are properly taken by Madame Patenotre alone, as she is the person affected, and not by the administrator, who is only a stakeholder.

1. At the time of testator's death, a bank held his collateral note secured by 4000 shares of International Combustion stock, the certificates for which were in the name of Eleanore Mayo Elverson, his wife, with transfer in blank, and 4500 shares of Hudson Motors in a name not disclosed. These shares were sold and the estate of Mrs. Elverson (or Green acting in the name of her executor) claims the proceeds on the ground of ownership.

As to Combustion stock, we agree with the Auditing Judge in allowing the claim because the certificate in the name of Mrs. Elverson was *prima facie* evidence of ownership. That it was found, not in the husband's possession, but pledged for his debt and assigned in blank is no evidence of transfer to the husband. The papers put the stock at the disposal of the pledgee, but do not show a delivery to the husband. Moreover, the confidential relation between husband and wife is such—a relation in which the husband is naturally the dominant member in most cases and which arises from a trait of human nature which all the married women's acts cannot alter—that the burden is on the husband to justify a transfer of property from his wife to himself; and in the absence of evidence that it is for a consideration or a gift of full free will, it is ineffective: Darlington's Appeal, 86 Pa. 512; Wormley's Estate, 137 Pa. 101; Loeffler's Estate, 277 Pa. 317.

As to the Hudson stock, the sole evidence in support of the claim is found in writings of Blackman, the administrator. One of these writings is a cablegram to Madame Patenotre's son in which he states that certain shares of this stock had been bought for Mrs. Elverson's account some months before her husband's death, of which 2500 had been deposited at this bank as collateral for her husband's note. The examination of Blackman as a witness referred only to the Combustion stock. The copy of the cablegram was produced by him at a later hearing among other communications, on call and over objection, for the light they might throw on the sale of the various stocks, and no claim of ownership of this item was then pending. The Auditing Judge thought that Blackman was bound by this admission. Assuming that the reference was to the stock in question, so he was. But the admissions of an

administrator do not bind the parties: Orr's Appeal, 7 W. N. C. 126; Rowland v. Clark, 250 Pa. 192; and we disagree with the Auditing Judge in concluding that Blackman was the agent or "special representative" of Madame Patenotre. She is now the party in interest, for the residue of the estate has disappeared and her legacy is impaired.

Blackman was vice-president of the "Philadelphia Inquirer," of which she was principal owner, and her representative there. He was the administrator, and she as a legatee (through her son) had asked him for a report on the condition and assets of the estate. But this is not an agency to act for her in dealing with third persons with regard to the estate and its assets. It was an agency to give her information (if it was an agency at all) and not an agency to give others information as to the ownership of what purported to be assets of the estate. Blackman did not attempt to act beyond the request. There is no evidence that he communicated this statement to Green or anyone else or that Green or anyone else in interest ever acted on the faith of it so as to create an estoppel. The approval of Mrs. Elverson's executors, known as Exhibit 1-68, of the sale of this Hudson and Combustion stock refers only to "shares registered in the name of Eleanore Mayo Elverson." These executors had no authority at all to bind Madame Patenotre by an admission.

Blackman also wrote Mrs. Elverson's executors a letter, stating that "securities belonging to said decedent" were held by the bank as security for her husband's note. This is ambiguous, as it may refer to the Combustion stock alone; and the same objection applies to this letter as an admission binding on Madame Patenotre.

Exceptions Nos. 1 to 9, inclusive, of Eleanor Elverson Patenotre are sustained, and her exceptions Nos. 10, 11, 12 and 13 are dismissed. Exceptions Nos. 1 to 13, inclusive, of Herbert E. Blackman, administrator d. b. n. c. t. a., are dismissed because he has no standing.

2. Exceptions Nos. 14 and 15 of Madame Patenotre and Blackman, administrator, relate to the ruling of the Auditing Judge that an agreement of February 26, 1930, was not binding on John Green. These exceptions were withdrawn.

3. Exception No. 16 of Madame Patenotre relates to the refusal of the Auditing Judge to set off against the admitted claims of the estate of Mrs. Elverson for advancements of $196,742.25 made to the estate of James Elverson, the sum of $11,314.59 distributed by her during the short time she was executrix to herself individually. This matter is not discussed by the Auditing Judge; but in his adjudication of the account of Mrs. Elverson as executrix of her husband's will (which was also before him) he deducted this sum from the amount awarded to Blackman as administrator. This seems to us incorrect, as there is no distribution for Mrs. Elverson as residuary legatee under her husband's will until it is known, on the audit of the administrator's account, that there is a residue. No distribution at all should be made at the audit of her account as executrix, because administration was not then finished. The exceptions taken to this action in the adjudication of her account will be sustained. The result is that the sum which will be awarded to Blackman as administrator d. b. n. c. t. a. exceeds by $11,314.59 what he actually got, and there is a deficit which he will be entitled to set off against the award of $196,742.25. This is in the nature of a set-off of one judgment against another, and as it appears clear that the deficit exists, exception No. 16 of Blackman, administrator (he has standing for this purpose, as the sum of $11,314.59 is due him as administrator), is sustained, as is also exception No. 16 of Madame Patenotre.

4. The account claimed credit in distribution for $45,475.02, "amounts distributed for the account of Estate of Eleanore Mayo Elverson," of which part was paid to John Green and part to others. The Auditing Judge regarded this as a distribution to Green or for his account, disallowed it as distribution here, and directed that a claim be presented for this sum against his distributive share of Mrs. Elverson's estate. From the language of the account and the statements in the brief of opposing counsel, we assume that the sums were paid out at the request of Mrs. Elverson's executor and that not all of them were for Green personally. Whether they were proper payments is not our concern here, but is the responsibility of the executor when its accounts are reviewed. The whole is a proper set-off against the item of $196,742.25 disbursed or advanced by Mrs. Elverson's executor at the request of James Elverson's administrator. Exceptions Nos. 17 and 18 of Blackman, administrator, and Madame Patenotre are sustained.

An order absolutely confirming the adjudication as herein modified will be entered by the clerk after fifteen days from this date, and leave is granted to John Green within that time to apply to the Auditing Judge for a rehearing and taking of further testimony with regard to the ownership of the Hudson Motors stock, in which case confirmation will be suspended and the account will be recommitted to the Auditing Judge for that purpose only on his order.