Karber *v.* Goldstrohm et ux., Appellants.

Argued October 8, 1931.  Before FRAZER, C. J., WALL-
ING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW,
JJ.

*Julius L. Schoenberg,* with him *W. M. Ewing,* for ap-
pellants.—Where relief is sought for cancellation of a
deed, the burden is on him who seeks the relief to show
that the gift made by the deed was not a voluntary and
intelligent act of the donor: Vaughan v. Vaughan, 217
Pa. 496; Northern T. Co. v. Huber, 274 Pa. 329;
Yeager's Est., 273 Pa. 359; Hamilton v. Fay, 283 Pa.
175; Moorhead v. Scovel, 210 Pa. 446; Modern Baking
Co. v. Orringer, 271 Pa. 152; Spangler Brewing Co. v.
McHenry, 242 Pa. 522; Keystone Guard v. Bearman,
264 Pa. 397; Youngman v. Water Comrs., 267 Pa. 490.

*W. D. Stewart,* of *Thorp, Bostwick, Stewart & Reed,* with him *Albert G. Brown,* for appellee, cited: McConville v. Ingham, 268 Pa. 507; Null's Est., 302 Pa. 65; Harrison v. Welsh, 295 Pa. 501; Leedom v. Palmer, 274 Pa. 22; Clark v. Clark, 174 Pa. 309.

OPINION BY MR. JUSTICE SIMPSON, January 5, 1932:

Plaintiff filed a bill in equity against the defendants, who are his only daughter and her husband, seeking to have reconveyed to him two properties which he had deeded to her. He alleged, inter alia, that the conveyance was obtained as the result of undue influence exercised over him by the defendants. This they denied, and asserted that it was made "in consideration of the home and care that he was to receive from them, as well as his natural love and affection" for his daughter. As testified to by defendants' witnesses at the trial, the "home and care" which plaintiff was to have, were to last as long as he desired them. After a painstaking review of the evidence and of the law applicable thereto, the trial judge sustained plaintiff's contention and reported a decree for a reconveyance and an accounting. Defendants' exceptions were overruled by the court in banc, the decree reported was entered and from it this appeal was taken. As the decree necessarily followed the facts found, which were, as we view the evidence, supported by the weight thereof, we might, for this reason alone, dismiss the appeal, especially as the trial judge, who saw and heard the witnesses, was better able than we are to determine what weight should be given to their testimony: Phillips's Est., 295 Pa. 349; Werner v. Hillman Coal & Coke Co., 300 Pa. 256. Respect for the earnest argument of defendants' counsel impels us, however, to consider the matter more at length, though necessarily somewhat briefly.

On or about April 20, 1929, plaintiff went to live with defendants. At that time he was 87 years old, and owned the real estate in dispute (which was worth $12,000

and rented for $85 a month), had a bank account of about $2,000, and was insured in a relief association. About two years before that time, he had had a stroke of paralysis, as the result of an advanced case of arteriosclerosis, which was incurable and of a progressive nature; after that he frequently had what the witnesses called "spells," during which he was childish and did not know what he was doing; and a year after the first stroke he had another, but a less severe one. His eyesight and hearing were much affected, he was subject to crying spells without apparent cause, and was readily susceptible to the influence of those surrounding him. Before he came to live with defendants he had resided with one of his sons, in whose favor he had made a will, but whether this was before or after he had had the first paralytic stroke does not appear.

When plaintiff arrived at defendants' home, his daughter refused even to see him, but he stayed in the house until his son-in-law returned. At that time, according to the latter, plaintiff "came tottering in through the kitchen and he said, 'Oh, I am here now. I was put out and was poisoned down there, and I ain't got no home up there any more, and I want to stay with you.'" There is no evidence justifying his alleged statement as to his treatment at his son's house, and we are convinced that, if he said it, it was not true. Indeed, one of defendants' witnesses said plaintiff "told me it was like heaven......at his son's home." After talking over the matter together, in the absence of plaintiff, defendants agreed to take him into their home, and for awhile treated him kindly. Shortly thereafter, however, they learned of the will he had made in favor of his son, and at once their conduct changed. The son-in-law says he then said to plaintiff: "'We made a resolution last night that I don't think we are going to keep you any longer. Now we ain't going to put you out. You look around. You've got lots of money, you've got property, you can go to a hotel or so. We'll give

you lots of time to find a good home.' He says 'Why?'. I says, 'Why, because Fred [the son] told me that Kate [the daughter] wasn't to have anything in your will, and for her to tie herself down in her old days and have nothing from the will, you should go some place and spend your money.'" This had a great effect on plaintiff, due to his mental and physical condition, and about an hour later, "with tears running down his cheeks," he said, according to the son-in-law: "Now, I tell you what I do. You get Preacher Green over and I make a new will, and I kill that will." Following this the son-in-law says: "I just smiled and said, 'Oh, grandpap, I think you are too old to make a will.'" If that statement was true, then plaintiff was too old to make a deed for the property, since it requires less mentality for a person to know and understand what he is doing when making a will, than it does when transacting ordinary business: Novicki v. O'Mara, 280 Pa. 411; Guarantee Trust & Safe Deposit Co. v. Heidenreich, 290 Pa. 249. The same rule applies, of course, to the conveyance of a property. Plaintiff then said, still according to the son-in-law: "I am too old to make a will? I ain't too old to sell. I own that property, and nobody is my boss. I can sell it," and then said he would sell it to his daughter for "nothing at all."

Apparently this is exactly what the son-in-law hoped and desired, for he had already been to the office of the recorder of deeds, without the knowledge of plaintiff, and had copied from the records thereof all the data necessary for the drawing of such a deed. This data he took to a lawyer of his own selection and had the deed drawn. When the son-in-law received it from the lawyer, he says he handed it to plaintiff, who was a German and could hardly read English at all, but who nevertheless, he says, read it down to the place where the size of the lot was stated, and then remarked it was "just like the old one," to which the son-in-law

assented, and was told to get a notary public so that plaintiff could execute it at once.

When the notary came, he insisted on another witness being present, and the son-in-law selected one upon whose property he, the son-in-law, had an overdue mortgage, which he had agreed not to call in. Plaintiff was not present while these preliminaries were being arranged, so the son-in-law went upstairs to plaintiff's room, *"motioned my finger"* to plaintiff, without telling him for what purpose he was wanted, and he at once obediently followed the son-in-law down stairs. The latter—not the plaintiff—then said to those present that plaintiff "was going to give this property over to his [the son-in-law's] wife."

Defendants' witnesses disagree as to whether or not plaintiff attempted to read the deed after he came down stairs, but the weight of their opinion is that it was read aloud in his presence. Admittedly, during the half hour or so the parties were there, there was no "conversation loud enough that [plaintiff] could have heard it," and "he did not say anything or answer any questions or engage in any conversation." When it came to signing the deed he was told to and did practice writing his name on other pieces of paper, then signed the deed where he was told to sign it, and immediately returned to his own room. Plaintiff says that he was sick when the son-in-law took him downstairs, that the sickness affected his eyes so that he could not read anything, and that with the aid of some one, who steadied his hand, he simply signed a paper where he was told to sign it, without being advised that it was a deed and without knowing that it was.

The consideration of $1 named in the deed was not paid. As already stated, the answer avers that the deed was executed "in consideration of the home and care that he was to receive from [defendants] as well as his natural love and affection for his daughter," yet the son-in-law, though repeatedly asserting he did not

know whether or not plaintiff paid any board, finally admitted that he paid $10 each week he lived with defendants. It is also clear, from the son-in-law's testimony, that although the deed purported to be a present conveyance in fee simple, it was not intended to be so. He admits that thereafter he took plaintiff to the tax office and had him pay the taxes on the property, and to the insurance broker's office and had him pay for the renewal of the insurance. This he attempts to explain by saying that by "that deed [plaintiff] didn't lose the ownership of that property......not until he throwed it up," that is, when later on "the ceiling and the plaster came down [in one of the houses described in the deed] then he throwed it up......and didn't want anything more to do with it." The son-in-law later attempted to explain this explanation by saying that what he meant was that until then plaintiff had collected the rents but afterwards did not, because he was "too old to attend to needed repairs." Later still, the son-in-law repeated that his "wife became the absolute owner of the property" when plaintiff "throwed it up."

It is also of considerable importance to note that after the execution of the deed, the son-in-law took plaintiff to the bank and had him transfer the $2,000 account therein into the name of the daughter, and endeavored also to get a transfer of the insurance to her. No consideration is averred for either of these transactions, though the net result, if full effect is given to them, would be to leave plaintiff penniless. It is also of moment that the daughter, though a party to the litigation and fully aware of the facts, could have, but did not take the witness stand to support her husband's story or contradict plaintiff, even as regards the matters which were personally known to the three of them only.

After plaintiff had been living with defendants for some six months, and had thus transferred all his es-

tate to his daughter, defendants got tired of keeping him and determined to get rid of him, though under obligation, as they say, to permit him to continue his home with them as long as he wished to do so. By their treatment of him, as the court below found, they practically forced him to leave their home and return to his son's.

It is clear to us that there was ample evidence to justify the chancellor's finding of fact that the deed was obtained by the use of undue influence, without which it would not have been executed. Defendants knew that he was sick as well as old, and that he could be readily induced to do anything for those by whom he was surrounded. From the time they learned he was willing to make a will in favor of his daughter, they schemed to get him to execute a deed to her, which would be irrevocable, as a will would not be; and that believing he had not long to live, and perhaps in a still less time would become mentally incapacitated, they permitted him to collect the rents from the property so that he would believe it still belonged to him, they at the same time receiving a full recompense for his board and lodging, in direct violation of the contract which they allege was a consideration for the deed, so that, in every contingency, they could suffer no loss by the transaction.

It is not, as is claimed by appellants, a question as to whether or not there is a presumption of undue influence growing out of a conveyance by a father to his daughter without any consideration being paid therefor. It is settled that no adverse presumption arises under such circumstances. The question is whether or not a deed, made without consideration, will be sustained as a gift because the grantee is a daughter, even though in fact it was obtained by the exercise of undue influence. We are clear that it should not be. In McConville v. Ingham, 268 Pa. 507, 518, where the facts were substantially the same as here, and we found the existence of weakness and dependence on the part of

the alleged donor, who was the grandmother of the alleged donee, we said, following earlier cases: "But when the relation existing between the contracting parties appears to be of such a character as to render it certain that they do not deal on equal terms, but that on the one side......from overmastering influence, or, on the other side, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, and the transaction is presumed void, and it is incumbent on the party in whom such confidence is reposed ......to show affirmatively that no deception was used, and that all was fair, open, voluntary and well understood. This principle is of very general application ......and the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise." In the instant case not only did defendants fail to carry the burden which this wise principle placed upon them, but the evidence clearly showed that they in fact exercised undue influence over plaintiff.

Much stress is laid on one of the findings of the trial judge, stating that plaintiff "understood the nature of the deed [to his daughter] and the intended conveyance was his conscious act"; but, as the court below points out, this cannot be taken to mean that it was made voluntarily and without undue influence, for, in the next two findings, it is expressly stated that "complainant did not convey the said real estate...... voluntary, but through undue influence exerted upon him by the defendants" at a time when he "was physically impaired by debility and was easily influenced by defendants." To sustain appellants' argument on this point, we would have to eliminate from the law all that relates to undue influence, for if a man is not cognizant of what he is doing when, without consideration, he conveys away all his property, this, without more, will make the deed void.

It is also urged that the effect of affirming the decree will be to give the property to the son, as devisee under plaintiff's will, to the exclusion of the daughter, as grantee under the deed. If this rightfully results, the property should be so given; if it does not, the courts will be swift to avoid the will also, if due application is made to them.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellants.