Oko *v.* Krzyzanowski, Appellant.

Argued March 3, 1942.

Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Arthur A. Maguire,* for appellant.

*Joseph P. Olexy,* with him *Andrew Hourigan, Jr.,* for appellee.

OPINION BY STADTFELD, J., July 27, 1942:

This proceeding was begun by Bill in Equity seeking the cancellation of a deed of conveyance of real property on the ground that the deed had been procured as the result of conspiracy. The appellant filed an answer raising preliminary objections to the bill. The appellee filed an amended bill. The objections were then dismissed by JONES, J. The appellant then filed his answer. The appellee set the case down for trial on bill and answer. At the commencement of the hearing on September 16, 1940, before Judge THOMAS F. FARRELL, appellant objected to taking testimony and moved for the dismissal of the bill because no replication had been filed. The motion was denied and testimony was taken. On September 27, 1940, a replication was filed nunc pro tunc by permission of the court. Testimony on behalf of the appellant was taken on November 8, 1940, November 25, 1940, and November 29, 1940.

The plaintiff, Stacia Oko, is the only child of John and Mary Lahut, and the step-daughter of the defendant, Vincenty Krzyzanowski. In August, 1921, the defendant took up his residence as a boarder in the home of John and Mary Lahut at Hudson, in Plains Township, Luzerne County, Pennsylvania. In September, 1924, the plaintiff, then Stacia Lahut, married. For a short time thereafter, she and her husband resided with her parents, but later went into housekeeping by themselves. Six children were born of this marriage, and were living at the time of the death of Mary Lahut, plaintiff's mother. In 1925, John and Mary Lahut purchased the lot of land which is the subject of this litigation. They constructed a house upon this lot. Title was taken by entireties and on the death of John Lahut in 1932, title vested in Mary Lahut, the surviving widow. Krzyzanowski, the defendant, continued to live at Mary Lahut's home after her husband's death. They obtained a marriage license on December 31, 1938, and were married on January 17, 1939. On the same day, shortly after the marriage ceremony, the said Mary (Lahut) Krzyzanowski was taken to the Wilkes-Barre General Hospital where on January 19, 1939, she underwent an operation. This disclosed that the whole upper part of her stomach was involved in a cancerous growth. She was taken home on February 11, 1939. On April 1, 1939, she was returned to the Wilkes-Barre General Hospital where she died of cancer on the following day, April 2, 1939.

On February 3, 1939, while the said Mary (Lahut) Krzyzanowski was still a patient in the hospital and her condition grave, her husband appeared at the bedside with his friend, John Konopka, and F. J. Ronky, who was experienced in real estate matters. She was led to believe that her husband was being pressed for the payment of her medical and hospital bill and that her signature was required for the purpose of

208

borrowing money. The paper to be signed was not shown nor read to her. The conversation was in the Polish language. Mary (Lahut) Krzyzanowski could not speak or read the English language. She was illiterate and could not write her name. She assented by touching the pen, whereupon Ronky wrote her name on the deed and affixed her mark. There was no notary present.

On the same day, Ronky, accompanied by Krzyzanowski, and Konopka, took the deed to an alderman and ex-officio justice of the peace in Wilkes-Barre, whose office is about two miles from the Wilkes-Barre General Hospital and who, in the absence of Mary (Lahut) Krzyzanowski, affixed his signature and seal to the acknowledgment certifying that both Krzyzanowski and his wife appeared before him and acknowledged the deed. Ronky recorded the deed the next day in the presence of the defendant.

The chancellor, FARRELL, J., in an adjudication filed, sustained the bill of the plaintiff and directed the entry of a decree nisi, setting aside and cancelling the deed. The chancellor on behalf of the court in banc, dismissed the exceptions of the defendant filed thereto, and in the decision filed directed the entry of the final decree. This appeal followed.

Appellant contends that the court below erred in finding the evidence of the alleged conspiracy to be clear, precise and indubitable. To sustain the allegation of the fraudulent execution of the deed, which is the material and controlling allegation, the plaintiff called Henrietta Kaszkiel. On account of its importance we quote her testimony as it appears of record: "Q. What is your full name? A. Henrietta Kaszkiel. Q. And where do you live? A. Georgetown. Q. Where in Georgetown? A. 663 East Northampton. Q. How long have you lived up in Georgetown? A. Oh, about 35 years. Q. Whether or not you were in the Wilkes-

Barre General Hospital in the early part of 1939? A. 29th of January. Q. You went in in January, 1939. Do you remember what day in January? A. 29th. Q. And how long did you remain in the hospital? A. Three weeks. Q. During the time that you were in the hospital did you know Mary Krzyzanowski? A. I met her in there, in the hospital, we were in neighboring beds, you know. Q. Adjoining beds? A. Yes, we were laying together, like neighbors. Q. And how long was Mrs. Krzyzanowski in the hospital? A. Well, I don't know how long she was there, but she was there when I came there; she was about a week before. Q. She was there before you came? A. Yes, sir. Q. Whether or not she left before you did? A. Yes, she left before me. Q. And do you remember three men coming to the hospital? A. Yes. Q. To see her one day? A. Yes. Q. Who were the men? A. Her husband, and Mr. Konopka and Mr. — with the glasses, Ronky. Q. Did you overhear some of the conversation, or any of the conversation that was had between Mary and these three men? A. Yes. Q. You did. Now will you tell us what conversation you heard? A. Yes. Q. Who said it, and what answers were made, and so forth; detail the conversation? A. Yes. Q. All right, go ahead and tell? A. Well, they came and they wanted so she sign, and she said husband taking, so he sign, and that Ronky said it is the law woman has to sign; and she said I am sick, I can't write, don't bother me; and then Mr. Ronky said Mrs. just touch pen, and put pen to her finger and she touched the pen, and took the paper, put in pocket, and signed, and he says O. K., Mrs., you could get now how much you want, even two hundred, and they went. Right away he signed and they went; and she turned her head to me and she said Mrs., do you think that won't be hurting my property. I think they sometimes cheat, and she said they making me sign, I don't know for

what, and she said—I said what is going on? She said well, the doctor wants the money and hospital wants the money, they ask me every day, and she said my husband had the money but that all gone, and he wants to loan from some saloonkeeper, and before so he could give us how much he wants he wants some kind of signing from me, I don't know what. I said to her that with the money that won't hurt, I said, because after you are going to get her money back, they will give you receipt; and she said to me—I said to her don't you ever Mrs. sign to nobody, and she said No, I won't, I have not signed to nobody yet, and she said my husband wants so I sign to him, but I have daughter, just only one child, she is first one to get Will from her father, and I said well you should make sometime Will, because you are very sick, and she said well if I die so go half and half; I feel sorry for my husband, but I feel sorry twice for my daughter. Q. Was the paper read to Mrs. Krzyzanowski that day? A. What? Q. Did they read a deed or read anything? A. Nothing at all. He just took the paper from his pocket is all, took like on the side, and she signed and they went. As soon as they went she started to ask me. Q. Now wait. Was the daughter there that day, Mrs. Oko? A. Yes, sir, but she wasn't there that time. Q. How often was she at the hospital? A. Oh, well, she always came every day. Q. Did her children come there? A. Yes. Q. Sometimes? A. Yes."

The allegation of fraud is further supported by the fact that the marriage of Mrs. Krzyzanowski to the defendant was not performed until a few hours before Mrs. Krzyzanowski went to the hospital for a serious abdominal operation. It is rather a suspicious circumstance that a man should seek to marry a woman suffering from a very serious illness immediately before her going to the hospital for an operation. The marriage fits so neatly with the deed by the entireties

that one is impelled to believe that the marriage and the deed were part of the same plan to acquire the property.

The allegation of fraud is likewise supported by the fact that the deed was not signed until after the operation. If Mrs. Krzyzanowski had in mind the transfer of her property to her husband at the time of the marriage, and the defendant testified that they had discussed the transfer before the marriage, it would be most natural to have carried out their intention before the operation, or at least have had her make a will. The time of the signing corroborates Mrs. Kaszkiel's testimony that the decedent believed she was borrowing money to pay doctors' and hospital bills. The allegation of fraud is also supported by the fact that the notary affixed an acknowledgment without seeing or conversing with Mrs. Krzyzanowski. This is admitted by the appellant. The allegation of fraud is further corroborated by the fact that Ronky obtained the description of the premises at the Court House. Why wasn't Ronky able to obtain the original deed from Mrs. Krzyzanowski and why didn't the defendant have access to it? This fact supports the conclusion that Mrs. Krzyzanowski didn't know of the proposed transfer.

Appellant contends that the court erred in finding that the evidence was such as not to invoke its two-witness rule. The two-witness rule does not apply where the purpose is not to vary the terms of the writing, but to set it aside entirely: Henry, Pa. Trial Evidence, (3d), §368, p. 548.

In the case of *Gordon v. Great Atlantic & Pacific Tea Co.*, 243 Pa. 330, 335, 90 A. 78, it was said: "...... 'where in a common law action the attempt is not to alter or contradict a written instrument, but to overcome it wholly and set it aside, the testimony of a single witness covering the point in controversy

no matter that it be contradicted by many opposing witnesses, requires a submission of the question of fact so raised to the jury'." See, *City of Pittsburgh v. Ihrig,* 256 Pa. 410, 100 A. 957.

In a case such as this the burden was on the defendant to show that the transaction was free from fraud. The following language from *Karber v. Goldstrohm et ux.,* 305 Pa. 470, 478, 157 A. 912, is peculiarly applicable: " 'But when the relation existing between the contracting parties appears to be of such a character as to render it certain that they do not deal on equal terms, but that on the one side ...... from over- mastering influence, or, on the other side, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, and the transaction is presumed void, and it is incumbent on the party in whom such confidence is reposed ...... to show affirmatively that no deception was used, and that all was fair, open, voluntary and well understood."

In *McCown et al. v. Fraser et al.,* 327 Pa. 561, 565, 192 A. 674, it was said: "Hence, when it appears that, by an inter vivos transaction, he has obtained a gift or other benefit from his confidant, he must, if the matter is questioned, prove affirmatively that it is unaffected by any taint of undue influence, imposition or deception: *Darlington's App.,* supra, (86 Pa. 512) ; *Stepp v. Frampton,* 179 Pa. 284; *McConville v. Ingham,* 268 Pa. 507; *Null's Estate,* supra, (302 Pa. 64). Such a transaction will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor fully explained to him, and done with a knowledge of its consequences: *Matthaei v. Pownall,* supra, (235 Pa. 460) ; *Corrigan v. Conway,* 269 Pa. 373; *Wil-*

*liams' Estate,* 299 Pa. 440." See also, *Shaffer v. Shaffer,* 344 Pa. 158, 23 A. 2d 883.

In *Pusic v. Salak et al.,* 261 Pa. 512, 518, 104 A. 751, the court said: "It would be less difficult to deceive such a man (an illiterate), especially where as in this case the paper was presented to him by his wife in whom he reposed confidence."

Appellant contends that the court below erred in refusing to dismiss the bill in equity, a responsive answer having been filed and the matter set down for hearing on bill and answer, no replication having been filed.

On September 27, 1940, the chancellor allowed a replication to be filed nunc pro tunc as of July 21, 1939. The plaintiff had rested her case on September 16, 1940, at which time the defendant offered no testimony. At page 176a of the record the chancellor correctly stated that at the first hearing of this case when counsel for the defendant first made his motion to dismiss the bill on the ground that there was no replication, in the discussion that followed the chancellor said that if an application were made to file a replication nunc pro tunc, it would be granted. The replication was filed as stated above. It was further understood that if a replication were filed counsel for the defendant should have an opportunity to adduce testimony. Thereafter the defendant introduced testimony at the hearings.

Whether or not a replication need be filed depends upon defendant's answer. Supreme Court Equity Rule No. 15 provides that: "...... replications ...... (except—where new matter has been averred in the answer) shall not be filed in equity, ...... save in those instances where by statute or these rules it is expressly so provided."

Supreme Court Equity Rule 52 provides that: "...... After fully answering the allegations of the

bill, defendant may under the specific heading 'New Matter', aver such additional facts, having a direct relation to any of the causes of action set forth in the bill, as he believes will entitle him to affirmative relief against plaintiff, and such other facts as may tend to invalidate an anticipated defense on plaintiff's part; and, either with or without setting forth additional facts, may pray such relief as he shall deem himself entitled to under the pleadings. To the additional facts, if any, he may require plaintiff to reply within fifteen days after service of the answer under penalty of having an order, as of course, entered by the defendant, that they be taken as admitted, with like exception, as in the case of an answer to the bill."

Under these Equity Rules a replication should not be filed unless the defendant avers additional facts as will entitle him to affirmative relief against the plaintiff under the heading "New Matter". Unless this requirement is met, the plaintiff's failure to file a replication does not give the defendant's allegations in the answer the quality of admitted facts.

"There being no averments of new matter in the original answer, the plaintiff was under no obligation to reply to explanatory allegations contained in the amended answer: Equity Rule 52. In fact, he was forbidden to do so by Equity Rule 15": *Bennett v. Erwin et al.*, 325 Pa. 330, 336, 189 A. 675; see, 8 Standard Pa. Practice, §§308, 309, p. 220.

"But if he does not choose to pursue this course, and does not set forth the new matter under that specific heading, thereby waiving a reply thereto by the plaintiff, the latter has nothing about which to complain. The purpose of the rule is not that plaintiff may have an opportunity to reply to alleged new matter, but that the defendant may require him to do so if he elects to take advantage of it. The choice lies with the defendant." 8 Standard Pa. Practice, §297, p. 215.

The defendant's answer in this case has not set out such additional facts as would entitle him to affirmative relief under a heading "New Matter".

Appellant further contends that the court below erred in refusing to strike out certain testimony of Henrietta Kaszkiel on the ground of hearsay. The testimony of Mrs. Kaszkiel was admitted without objection when given in chief. It was brought out again by counsel for the defendant on cross-examination. No objection was made while the testimony was taken. The motion to strike out was not made until the testimony was closed at the second hearing, two months after the testimony was first adduced.

Where evidence, incompetent as hearsay, but relevant and material to the question in issue, is admitted without objection, the court may treat it as legal evidence: Henry, Pa. Trial Evidence, (3d), §418, page 634; See, *Harrah v. Montour Railroad Company*, 321 Pa. 526, 184 A. 666.

Where testimony is received without objection and a motion to strike out is not made until the testimony is closed, the refusal to strike out is not reviewable: *Fuller v. Palazzolo et al.*, 329 Pa. 93, 197 A. 225. A party cannot complain on appeal, of error in the admission of testimony of the adverse party at the trial where such testimony was elicited on cross-examination and no motion was made to strike it out: *Regina et al. v. Monroe County*, 319 Pa. 257, 179 A. 36.

Irrespective of the admission of the testimony of the witness, we believe that under the circumstances under which the deed was obtained and the confidential relationship between the parties the defendant failed to sustain the burden resting upon him.

We believe that the court arrived at a correct conclusion and the decree should be affirmed.

Decree affirmed at costs of appellant.